Johnnie T. BURTON, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CF–1252.

District of Columbia Court of Appeals.

Argued April 21, 1994.
Decided Dec. 12, 1994.

I.

Ivan M. Waldman, Rockville, MD, for appellant.

Miriam M. Smolen, with whom Eric H. Holder, U.S. Atty., John R. Fisher, Elizabeth Trosman, and Rachel Adelman–Pierson, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN,[*] SCHWELB, and KING, Associate Judges.

Opinion for the Court by Associate Judge KING.

Concurring opinion by Associate Judge FERREN at p. 749.

Dissenting opinion by Associate Judge SCHWELB at p. 750.

KING, Associate Judge:

Appellant challenges the denial of his motion to suppress evidence that was obtained as a result of what he claims was an illegal seizure and a subsequent warrantless, nonconsensual search. The principal issue presented is whether consent to search, once given, can be withdrawn by an act or comment that falls short of an unequivocal expression of withdrawal of consent. We hold that it cannot, and since the other grounds asserted by appellant in his challenge to the trial court's denial of his motion to suppress are without merit, we affirm.

Burton entered a conditional plea of guilty[1] to a single count of unlawful possession with intent to distribute a controlled substance, to wit, cocaine.[2] Prior to entering the guilty plea, appellant had moved to suppress the cocaine on the ground that it had been obtained from him in violation of the Fourth Amendment. At the hearing on the motion, the government presented the following facts.

On October 30, 1991, at approximately 5:00 a.m., Detectives Kimerly Oxendine, Ronnie Hairston, and two other members of the Metropolitan Police Force, Drug Interdiction Unit, boarded a bus at the Greyhound Bus Station located in Northeast Washington, D.C., intending to interview the passengers. The detectives were dressed in plainclothes, and none displayed a weapon. Although the bus had just arrived from New York City, a location known to be a major source for illegal drugs, the officers had no specific information that anyone on that bus possessed drugs. Oxendine interviewed one passenger and then approached appellant, who was seated in the window seat in the third row from the rear on the driver's side of the bus. At the time, appellant was twenty-three years old and resided in Richmond, Virginia.

Oxendine identified herself as a police officer, displayed her "identification folder," and asked appellant if she could speak to him. The detective testified that as she spoke to appellant, she was standing in front of the row of seats directly ahead of appellant, so as not to block his path to the aisle; Hairston had previously situated himself in a seat one or two rows behind appellant, and the other two detectives were at the front of the bus. Thus, none of the officers was in the aisle near appellant's seat. Appellant agreed to speak to Oxendine, and after she requested

---

[*] Judge FERREN was *Acting Chief Judge* at the time of argument. His status as an *Associate Judge* resumed on June 14, 1994.

1. Super.Ct.Crim.R. 11(a)(2) provides:
   With the approval of the Court and the consent of the government, a defendant may enter a plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

2. D.C.Code § 33–541(a)(1) (1993).

permission to inspect his ticket he gave it to her. She observed that appellant was traveling from Newark, New Jersey to Richmond, Virginia and then returned the ticket to appellant. The detective also asked appellant to point out his luggage, which he identified on the rack above his head. Oxendine explained to appellant that she was a member of the Drug Interdiction Unit, and she then inquired whether he was carrying any drugs or guns. Appellant denied carrying either, and he consented to Oxendine's request to search both his luggage and his person. Thereafter, Oxendine searched the luggage and, finding nothing of an incriminating nature, directed Hairston, a male officer, to search appellant.

Hairston then approached Burton, identified himself as a police officer, and informed appellant he was going to conduct a search. Hairston noticed a bulge in the left inside pocket of appellant's jacket, and just as the detective "started to search Mr. Burton, [appellant] grabbed his jacket and he looked to the—towards the window. He also put his [right] hand into the inner left outer coat that he was wearing." It appeared to Oxendine that appellant, as he turned toward the window, was attempting to extract something from the pocket and hide it between the seat and the side of the bus. Hairston told appellant to remove his hand from the jacket, appellant complied without saying anything, and Hairston reached into the pocket and removed a package wrapped in grey duct tape. The package was later determined to contain powdered cocaine; another package, containing powdered cocaine and a rock of cocaine, was then recovered from appellant.

Burton's own testimony contradicted the government's evidence on four separate points. First, appellant testified that Oxendine was "standing over him" in the aisle next to where he was seated, and that he would have come into contact with her had he attempted to leave his seat. Second, he claimed Oxendine requested permission to inspect both his ticket and driver's license and that she never returned either of them.[3] Third, appellant maintained that he refused to consent to the search of his luggage and person. Lastly, Burton testified that Hairston threatened him before beginning the pat-down, advising appellant that "if you don't cooperate, we're going to whip your a-s-s on this bus."[4]

The trial court credited the testimony of the detectives and in a written order found that:

> the defendant's movement of his body away from Detective Hairston and the placing of his hand inside his coat could have been interpreted in several ways. As Detective Oxendine testified, she thought the defendant was either trying to hide something or trying to discard something. On the other hand, Detective Hairston thought the defendant might be reaching for a weapon.... [T]he defendant testified that he was indicating his desire not to be searched. The court concludes that it was objectively reasonable for the detectives to have drawn all of these impressions from the defendant's actions.

> Having voluntarily given unlimited consent for the police officers to search him, the defendant created an atmosphere which caused the detectives to believe that they had been given authority to conduct the search to its completion. While this court has no doubt that the defendant had the right to terminate the search before it was completed, the court also concludes that the defendant could only do so if his words and or actions were *unequivocal.*

(emphasis added) (footnote omitted). Thus, the trial court ruled that appellant had voluntarily consented to the search and had not unequivocally withdrawn his consent during the search. On appeal, appellant contends the evidence should have been suppressed as the fruit of an illegal seizure of his person. He next contends that the subsequent search

---

**3.** As noted *supra* at p. 743, Oxendine testified that she only requested Burton's ticket and after examining it she immediately returned it to him. On remand, after oral argument, the trial judge, making further findings at our request, credited Oxendine's testimony on that score.

**4.** On remand, see note 3 *supra*, the trial judge found that no such threat was made.

was otherwise tainted because it was nonconsensual, any consent he gave was involuntary, and, even if consent was given, he withdrew it during the search.

## II.

■ Burton first contends that the officers' conduct amounted to an illegal seizure of his person without probable cause and, therefore, the evidence obtained following the seizure should have been suppressed.[5] Burton maintains that a seizure occurred because of the "coercive" nature of the encounter, emphasizing that Oxendine was situated only a few feet away from him, Hairston was seated behind him, and two other officers blocked the exit of the bus.

In *In re J.M.*, 619 A.2d 497 (D.C.1992) (en banc), we were faced with similar circumstances involving an encounter with a juvenile by Metropolitan Police detectives on an interstate bus. We held, despite the fact that the detective stood next to J.M. during the interview and search, that "the police conduct was not so intimidating that a reasonable person would have felt incapable of declining the officers' requests or otherwise

terminating the encounter." *Id.* at 502. In contrast to *In re J.M.*, in testimony credited by the trial court, Oxendine stated that had appellant attempted to terminate the conversation, he could have gotten out of his seat and walked down the aisle in either direction since she was standing in front of the seat directly ahead of appellant "so that [she] wasn't blocking his path to get ou[t] of the seat." *A fortiori*, if there was no seizure in *In re J.M.*, there could be no seizure here.[6]

Moreover, in the totality of the circumstances, which included the fact that the detectives were dressed in plainclothes, their weapons were concealed, and Oxendine addressed appellant in a polite, conversational tone of voice, requesting permission to speak with appellant rather than demanding it, we conclude that the officers' presence did not rise to the level of a "threatening presence." *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Although appellant was not informed that he had a right to terminate the interview, whether or not he was so informed is not dispositive on the issue of whether there was a seizure. *See id.* at 555, 100 S.Ct. at

---

5. Appellant filed a written motion to suppress statements and, apparently, a written motion to suppress physical evidence (which is not included in the record on appeal); the government filed an opposition to both motions. Thereafter, an evidentiary hearing was conducted during which the trial court heard testimony from the detectives and appellant. The issue of the seizure of the person was raised by appellant, but the trial court did not make an explicit finding on that point. The trial court ruled that appellant had voluntarily consented to the search of his luggage and his person, but directed the parties to submit additional arguments in writing on the issue of whether appellant's conduct constituted a withdrawal of consent. In his supplemental pleading, appellant again raised the seizure of the person issue. Although the trial court did not explicitly decide that issue in its subsequent written order, the court, citing *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), reiterated its previous ruling that appellant had voluntarily consented to the search. We think it is implicit in that finding, as well as the findings at the conclusion of the hearing, that the trial court also rejected the claim that there was an illegal seizure of the person. In this court in renewing his claim that

there was an illegal seizure, appellant does not contend otherwise.

6. *See also Bostick, supra* note 5, 501 U.S. at 435, 111 S.Ct. at 2388 ("no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required"); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1982) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen") (citing *Dunaway v. New York*, 442 U.S. 200, 210 n. 12, 99 S.Ct. 2248, 2255 n. 12, 60 L.Ed.2d 824 (1979); *Terry v. Ohio*, 392 U.S. 1, 31, 32–33, 88 S.Ct. 1868, 1885, 1885–86, 20 L.Ed.2d 889 (Harlan, J., concurring), 34, 88 S.Ct. at 1886 (White, J., concurring) (1968)); *United States v. Lewis*, 287 U.S.App.D.C. 306, 311–12, 921 F.2d 1294, 1299–1300 (1990) (no seizure occurred where the officers boarded bus, interviewed passengers, inspected tickets and identification, did not wear badges, or display weapons).

1877.[7] We hold, therefore, that there was evidence in the record to support the conclusion that appellant was not seized prior to the search of his person. *See In re J.M., supra,* 619 A.2d at 500 (this court reviews the determination of a seizure *vel non* as a question of law) (citation omitted).

## III.

Having determined that Burton was not seized does not end our inquiry. Warrantless searches are *per se* unreasonable, subject "to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1972) (citations omitted).[8] Appellant contends, however, that: (1) he did not consent to the search; (2) any consent that he did give was involuntary; and (3) if he did consent, he withdrew that consent prior to the time Hairston seized the cocaine.

### A.

■ On the question of whether appellant consented to be searched, the trial court credited the testimony of the police officers, rejected appellant's testimony that he did not consent and that Hairston threatened him, and concluded that appellant consented to the search. "Because this determination is essentially factual, we are bound to uphold the trial court's finding that [the] search was consensual" as that finding is supported by the record. *Kelly, supra* note 8, 580 A.2d at

1288 (citation and internal quotation omitted).

### B.

■ The Supreme Court has held that the government is not required to establish that a defendant knew that he or she had a right to withhold consent in order to uphold a finding that a consent to search was voluntary. *See, e.g., Schneckloth, supra,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59. Rather, the government must establish in the totality of the circumstances[9] that consent was, in fact, freely given. *Id.* at 222, 93 S.Ct. at 2045. While the government's burden falls short of establishing a knowing and intelligent waiver of the right not to consent to a search, "[t]o approve such searches without the most careful scrutiny would sanction the possibility of official coercion." *Id.* at 229, 93 S.Ct. at 2048. Thus, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.*

■ We conclude that the trial court had a sufficient basis for finding that consent was voluntarily given. Burton testified essentially that he was aware he was not obligated to acquiesce in the detective's request that he allow the search. In addition, although the encounter occurred at an early hour of the morning, there was no custodial detention or physical coercion by Oxendine and Hairston, only a few brief questions; the request for consent and the subsequent searches were closely related in time; appellant acknowledged that Oxendine addressed him in a polite, conversational tone of voice; and there was no evidence whatsoever that appellant suffered from any intellectual deficiency or that appellant's age affected his capacity

7. *See also United States v. Smith,* 284 U.S.App. D.C. 64, 66, 901 F.2d 1116, 1118 (1990); *United States v. Lloyd,* 276 U.S.App.D.C. 118, 122, 868 F.2d 447, 451 (1989).

8. *See also Symes v. United States,* 633 A.2d 51, 53–54 (D.C.1993); *In re J.M.,* 596 A.2d 961, 967 (D.C.1991); *Kelly v. United States,* 580 A.2d 1282, 1288 (D.C.1990); *Davis v. United States,* 532 A.2d 656, 658 (D.C.1987).

9. The factors the *Schneckloth* Court deemed to be important in assessing the "totality of the

circumstances" were "the youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment." *Id.* 412 U.S. at 226, 93 S.Ct. at 2047 (citations omitted). According to the Pretrial Services Agency report prepared, with appellant's input, to aid the court in setting bail, at the time of the arrest appellant was twenty-three years old, had ten years of education, and had no apparent health problems.

to consent. *See Schneckloth, supra,* 412 U.S. at 226, 93 S.Ct. at 2047; *see also supra* note 9. Although appellant testified that Hairston threatened him, the trial court did not credit that testimony, finding it to be inconsistent with appellant's other testimony. Thus, after carefully considering all the evidence presented—especially appellant's admission that he was aware of his right to end the encounter with the detectives—we hold that the trial court did not err in finding that the consent was voluntary. *See Kelly, supra* note 8, 580 A.2d at 1288.

### C.

■ Whether or not a suspect may unilaterally withdraw consent to a search once it was voluntarily given has never been expressly decided by this court. In *Florida v. Jimeno,* 500 U.S. 248, 252, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991), the Supreme Court held that a suspect's right to be free from unreasonable searches is not violated when the scope of the search is within the bounds of the suspect's authorization, noting, however, that "[a] suspect may of course delimit as he chooses the scope of the search to which he consents." [10] The *Jimeno* Court reasoned that the scope of a consent under the Fourth Amendment is judged on a standard of "objective" reasonableness, *i.e.,* "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251, 111 S.Ct. at 1803–04 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 183–89, 110 S.Ct. 2793, 2798–2802, 111 L.Ed.2d 148 (1990)). It has also

been held that while a suspect may limit or revoke consent to a search, such limitation or revocation must be made before the search is completed. *See United States v. Dyer,* 784 F.2d 812, 816 (7th Cir.1986). We think these authorities compel the conclusion that when the basis for a warrantless search is consent, consent may be withdrawn any time prior to completion of the search, and we so hold.

■ We must next decide what standard should be applied in determining whether consent was in fact withdrawn. Appellant maintains that his evasive behavior, "an *equivocal* attempt to revoke his consent," was enough to satisfy the objective reasonableness standard (emphasis added). The United States Court of Appeals for the Fifth Circuit has held, however, that conduct falling short of "an *unequivocal* act or statement of withdrawal" is not sufficiently indicative of an intent to withdraw consent. *United States v. Alfaro,* 935 F.2d 64, 67 (5th Cir. 1991) (emphasis added). *Accord State v. French,* 203 Neb. 435, 279 N.W.2d 116, 119–120 (1979); *Lawrence v. Commonwealth,* 17 Va.App. 140, 435 S.E.2d 591, 595 (1993), *aff'd,* 247 Va. 339, 443 S.E.2d 160 (1994) (citation omitted); *cf., Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (after waiving right to counsel during interrogation, suspect must unambiguously request counsel to stop further questioning). Other courts have implicitly adopted an unequivocal revocation of consent standard, holding that the conduct withdrawing consent must be an act [11] clearly inconsistent

---

**10.** *See also Mason v. Pulliam,* 557 F.2d 426, 428 (5th Cir.1977) (holding that "[n]othing in *Schneckloth* suggests . . . that a consent which waives Fourth Amendment rights cannot be limited, qualified or withdrawn"); 3 WAYNE R. LA-FAVE, SEARCH AND SEIZURE § 8.1(c), pp. 172–73 (2d ed.1987) (recognizing that, although there is authority to the contrary, the better rule is that consent may be withdrawn or limited).

**11.** *See, e.g., United States v. Ibarra,* 731 F.Supp. 1037, 1039 (D.Wyo.1990) (closing and locking trunk of vehicle after a consensual search), *aff'd,* 955 F.2d 1405 (10th Cir.1992); *Cooper v. State,* 480 So.2d 8, 11 (Ala.Crim.App.1985) (locking plane doors after a consensual search); *People v. Hamilton,* 168 Cal.App.3d 1058, 214 Cal.Rptr. 596, 602 (1985) (attempting to close bedroom door was a "direct, positive" act inconsistent

with consent); *State v. Reagan,* 209 Conn. 1, 546 A.2d 839, 844–45 (1988) (third person's act of standing in threshold "where it would make it difficult for [officer] to get by"), *appeal denied,* 211 Conn. 805, 559 A.2d 1139 (Conn.1989); and *Nease v. State,* 484 So.2d 67, 69 (Fla.Dist.Ct. App.) (running away from narcotics agents), *aff'd,* 494 So.2d 1153 (Fla.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987).

One commentator has observed, however, that "[t]he gist of the cases suggest that the consenter must verbalize his or her limitation; actions sometimes are not enough. Some actions clearly would be; e.g., stopping an officer from opening a door or a car trunk." 1 JOHN W. HALL, JR., SEARCH AND SEIZURE § 8:55, pp. 462–63 n. 46 (2d ed.1991). It is also clear from the cases cited here and *infra* note 13, that under the objective

with the apparent consent to a search, an unambiguous statement [12] challenging the officer's authority to conduct the search, or some combination of both.[13] For example, the closing and locking a car trunk and the shutting of a bedroom door are acts that courts have held to be express revocations of consent.[14] Conversely, courts have held that an equivocal act [15] or statement [16] cannot reasonably be interpreted as conveying an indication that consent has been withdrawn. For example, in *Luther, supra* note 15, the defendant's act of closing and locking the door to his room, together with his acquiescence in later efforts to open the door for the police, was held not to have constituted a revocation of consent. *See Luther, supra* note 15, 663 P.2d at 1263.

The United States Court of Appeals for the District of Columbia Circuit has held that equivocal conduct is not sufficient to reasonably convey the withdrawal of consent previously given. In *Joseph, supra* note 13, the defendant, while standing in an open area of Amtrak's Union Station depot, reached into a bag being searched by a Metropolitan Police officer after he had consented to the search, remarking: "[d]o we have to do this here? . . . I have underwear and things in the bag." *Joseph, supra* note 13, 282 U.S.App.D.C. at 105, 892 F.2d at 121. Joseph then accompanied the officers to a secluded alcove where they completed the search, which uncovered a revolver and crack cocaine. The court held that Joseph's conduct of reaching into the bag, together with his query and assent to the continuation of the search, did not constitute a withdrawal of consent. *Id.* at 106, 892 F.2d at 122.

In *Lawrence, supra*, a Drug Enforcement Administration officer approached Lawrence in an Amtrak station after his return trip from a "source city." *Lawrence, supra*, 435 S.E.2d at 592. Eventually consenting to a

reasonableness standard, the less equivocal a defendant's actions are, the more obvious is the intent to withdraw consent.

12. *See, e.g., United States v. Miner,* 484 F.2d 1075, 1076 (9th Cir.1973) ("No it's personal"); *United States v. Dichiarinte,* 445 F.2d 126, 128–29 (7th Cir.1971) ("The search is over. I am calling off the search."); *United States v. Bily,* 406 F.Supp. 726, 728–29 (E.D.Pa.1975) ("That's enough. I want you to stop."); *Villari v. State,* 372 So.2d 522, 523–24 (Fla.Dist.Ct.App.1979) ("Don't you need a search warrant to look at my personal belongings?"); and *French, supra,* 279 N.W.2d at 119–20 ("defendant's unequivocal 'no' could only be reasonably interpreted as revoking whatever consent might have previously been given, if any").

13. *See, e.g., United States v. McCarthur,* 6 F.3d 1270, 1274, 1277 (7th Cir.1993) (defendant zipped luggage closed and told officer she did not want him to see her personal items); *United States v. Carter,* 300 U.S.App.D.C. 36, 37–38, 985 F.2d 1095, 1096–97 (1993) (defendant snatched paper bag back from officer, saying "[t]here's food in there; I will show you"); *Goldberg v. State,* 407 So.2d 352, 352 (Fla.Dist.Ct.App.1981) (stating "[h]ey, that is my personal stuff," as defendant "lunge[d]" toward package, constituted a withdrawal of consent); *but see United States v. Joseph,* 282 U.S.App.D.C. 102, 106, 892 F.2d 118, 122 (1989) (reaching into bag and saying "[d]o we have to do this here? . . . I have underwear and things in the bag," did not constitute effective withdrawal when defendant then accompanied officers to a more secluded area for the completion of the search).

14. *See, e.g., Ibarra, supra* note 11, 731 F.Supp. at 1039, and *Hamilton, supra* note 11, 214 Cal.Rptr. at 602, respectively.

15. *See, e.g., United States v. Archer,* 840 F.2d 567, 573 (8th Cir.) (defendant verbally consented to search while refusing to execute a written consent form), *cert. denied,* 488 U.S. 941, 109 S.Ct. 364, 365, 102 L.Ed.2d 354 (1988); *State v. Luther,* 63 Or.App. 86, 663 P.2d 1261, 1263 (1983) (en banc) (although defendant closed door to his room, there was no "express revocation" where defendant "tried to open door himself, told a police officer that his mother had a key and made no objection to the police obtaining the key or opening the door"), *aff'd,* 296 Or. 1, 672 P.2d 691, 672 P.2d 691 (1983) (en banc); and *Lawrence, supra,* 435 S.E.2d at 594–95 (rearranging contents of pants pocket).

16. *See, e.g., Alfaro, supra,* 935 F.2d at 67 ("I have to go outside and talk to Lieutenant [Steve] Morville"); *United States v. Brown,* 884 F.2d 1309, 1312 (9th Cir.1989) ("Any reluctance [defendant] showed in admitting he was carrying the keys to his luggage was not enough to indicate he had withdrawn his unambiguous statement of consent."), *cert. denied,* 493 U.S. 1025, 110 S.Ct. 732, 107 L.Ed.2d 750 (1990); *United States v. Brady,* 269 U.S.App.D.C. 18, 20 n. 6, 842 F.2d 1313, 1315 n. 6 (1988) (disclaiming ownership of luggage); and *State v. Morocco,* 99 N.C.App. 421, 393 S.E.2d 545, 550 (1990) (statement to the effect that defendant's "bag contained some nude photographs of [his] wife").

search of his person, Lawrence voluntarily began to empty his pockets. When the officer noticed that Lawrence had emptied all of his pockets except his left front pants pocket, he:

> asked [Lawrence] what was in his left front pants pocket and [appellant] replied ... "Nothing." Then [the officer] asked him if he would mind showing me what was in his pocket and [appellant] put his left hand into his front pants pocket. As he did so, he pushed the large bulge to the rear of his pocket.... He pulled out several tissues and handed them to me and said, "That's all I have." [The officer] then reached down and touched the bulge with the back of [his] hand and asked him again, "What is it?" He again put his hand in his left front pants pocket, pushed the bulge to the rear again and pulled out a set of keys.... [The officer] then asked him again what was in his pocket and ... [appellant] thrust his hand into his pocket.

*Id.* at 594 (some alterations in original). The officer then removed Lawrence's hand from the pants and extracted a package from the pocket containing multiple packets of heroin. *Id.* The court, concluding that Lawrence's conduct fell short of an "unequivocal act or statement of withdrawal," held that consent had not been withdrawn because Lawrence's "hesitancy" could have been reasonably construed by the officer as an "extreme[ ] reluctan[ce]" to facilitate the search. *See id.* at 595 (citations and internal quotations omitted).

The import of *Luther* and *Lawrence,* and the other cases cited, is that equivocal conduct can be construed in many different ways and it, therefore, does not pass muster under an objective reasonableness test. *See, e.g., Alfaro, supra,* 935 F.2d at 67; *Brown, supra* note 16, 884 F.2d at 1312; *Brady, supra* note 16, 269 U.S.App.D.C. at 20 n. 6, 842 F.2d at 1315 n. 6; *Archer, supra* note 15, 840 F.2d at

573; *Morocco, supra* note 16, 393 S.E.2d at 550. We are persuaded by these authorities and we, accordingly, hold that an effective withdrawal of consent requires unequivocal conduct, in the form of either an act, statement, or some combination of the two, that is inconsistent with the consent to the search previously given.

■ Here, appellant was sitting in the window seat with the window to his left. The trial court found that appellant's conduct in putting his hand into his left pocket as he turned toward the window was not an unequivocal withdrawal of consent. It is undisputed that after he granted Oxendine permission to search, appellant said nothing at all to either detective.[17] Appellant complied without comment with Hairston's request to remove his hand from his pocket. Moreover, there is no evidence that appellant did anything that could objectively be interpreted as signifying withdrawal of consent, such as pushing the detective away or attempting to leave his seat.

In fact, there were a number of possible explanations for appellant's conduct. For example, appellant's furtive actions could reasonably have been interpreted, as Oxendine and Hairston respectively testified, as an attempt to hide the contents of his pocket or to acquire a weapon. In addition, as the government has suggested, the movement could have also indicated the reflexive response of a guilty conscience or an attempt to assist the detective's search. Further, while the trial court noted that appellant's movement could be considered to be an attempt to withdraw consent, it could have as readily been interpreted as an attempt to discard the drugs before they were found on appellant's person, thus acknowledging the widespread, and not always mistaken, belief on the part of narcotics violators, that they cannot be successfully prosecuted unless the contraband is actually found on their person.[18] As

---

17. Although appellant claimed that he did not consent to the search, there is no dispute that, after Hairston approached and began the search, appellant said nothing to either detective until well after the contraband was recovered.

18. *See Harris v. United States,* 614 A.2d 1277, 1278 (D.C.1992) (defendant threw to the ground

a bottle containing packets of PCP-laced marijuana); *Edmonds v. United States,* 609 A.2d 1131, 1132 (D.C.1992) (defendant threw to the ground a paper bag containing packets of crack cocaine), *cert. denied,* —— U.S. ——, 113 S.Ct. 2983, 125 L.Ed.2d 679 (1993); *Porter v. United States,* 561 A.2d 994, 995 (D.C.1989) (defendant threw to the ground a bag containing packages of PCP-laced

the Court of Appeals of Virginia observed, the mere reluctance to facilitate a search does not satisfy the objective reasonableness standard. *See Lawrence, supra,* 435 S.E.2d at 595. We hold, therefore, that a reasonable police officer could conclude, in these circumstances, that Burton's conduct did not constitute an unequivocal withdrawal of consent.

To hold otherwise would require the police in future cases to scrutinize every gesture for an indication that a suspect may possibly wish to withdraw consent when he or she has otherwise failed to clearly express that desire. We agree with Judge Walton's observation that unless withdrawal of consent is unequivocal:

> police officers who have been given express consent to search by a person would have to go through the unrealistic task of second-guessing a clear verbal expression of permission to search because of subsequent words and or actions that may, or may not[,] be intended to convey to the officers a desire to alter their impression that they could conduct the search, as clearly shaped by a definite and unambiguous voluntary statement of the defendant.

For the reasons stated, we hold that the trial court did not err in denying appellant's motion to suppress. Accordingly, the ruling of the court is hereby,

*Affirmed.*

FERREN, Associate Judge, concurring:

Unless the police have advised a passenger on a bus that the passenger is free to refuse consent to a search of his or her luggage and person, I find it hard to believe that many passengers can legitimately be found to have consented to such a search voluntarily under the applicable, subjective test for consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *In re J.M.,* 619 A.2d 497, 502–03

(D.C.1992) (en banc).[1] As Judge SCHWELB indicates, the inherently coercive environment makes truly voluntary consent unlikely. Here, however, the trial court found appellant Burton had consented to the searches, and, although I am skeptical about this finding, I must agree that, under the applicable standard of review, the court's finding cannot be held "clearly erroneous." *See id.,* at 500.

Furthermore, I must agree with Judge KING that, under persuasive caselaw, appellant's initial consent must be deemed continuing, absent an unequivocal withdrawal of consent—for example, by simply saying "no" or walking away. Equivocal gestures, if deemed sufficient for withdrawal of consent, would make consensual searches altogether untenable because the police could never be sure, without continuing inquiry, whether a person had consented to the search or not; as a practical matter, the police would search at their peril even when the suspect at first had unequivocally consented to the search.

In sum, probably the most crucial issue in cases such as this, or so it seems to me, is whether the suspect's agreement to the search is sufficiently clear to warrant a finding of consent in the first place. Because the very environment of a search on the bus is so fraught with coercion, I believe it is highly questionable for a trial judge to find consent in the absence of a statement by the police to the suspect—as there was in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)—that he or she is free to withhold consent. But, apparently, such a statement is not constitutionally required. *See Schneckloth,* 412 U.S. at 221, 93 S.Ct. at 2044–45; *In re J.M.,* 619 A.2d at 502–504; *see also* 3 WAYNE R. LaFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.2(i), at 213 (2d ed. 1987). Because I cannot say the trial court clearly erred in

---

marijuana); *see also Collins v. United States,* 596 A.2d 489, 495 n. 1 (D.C.1991) ("Sometimes the stratagem works and sometimes it doesn't.") (Schwelb, J., dissenting).

1. The question whether a passenger has "consented" to a search is legally distinct from—though in bus search cases it is conceptually very close to—the question whether the bus passenger has been "seized." *See In re J.M.,* 619 A.2d at

499–501. The latter question is answered by reference to an objective, reasonable person standard. *See Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) ("whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter"). Appellant's seizure is not an issue in this case.

finding consent here, the police were entitled to rely on Burton's consent until he, without question, withdrew it. On this record, the trial court did not clearly err in finding Burton did not do so.

SCHWELB, Associate Judge, dissenting:

The trial judge, who wrestled with the difficult constitutional issue presented by this record in a thoughtful and conscientious manner, stated during an exchange with counsel (which occurred after all the evidence was in) that "I think it's a very close case." I agree with the judge. Realistically, however, in light of all of the circumstances as described by the judge shortly after he heard the testimony, I cannot join the majority in its essentially legal conclusion [1] that Burton's consent to the search of his person could reasonably be characterized as voluntary at the time that it took place. Accordingly, I respectfully dissent.

## I.

### THE "INHERENTLY COERCIVE NATURE" OF THE POLICE CONDUCT

In taking the case under advisement, the trial judge asked rhetorically whether

considering how closely I think you have to scrutinize these types of situations because of the *inherent[ly] coercive nature* of the police approaching someone in a confining situation like a bus, need not the police be very circumspect in reference to what they do?

(Emphasis added). The judge viewed the situation in this case as "totally different"

from a request to search made at a defendant's home, or even on the street, because "that would have a different psychological impact under these circumstances." The judge thus recognized, shortly after hearing the testimony, that the situation confronting Burton was "inherently coercive." [2] Moreover, in my view, the existence of coercive pressures was not due solely to the physical layout of the bus. "Many persons, perhaps most, would view the request of a police officer to make a search as having the force of law." *State v. Johnson*, 68 N.J. 349, 346 A.2d 66, 68 (1975). In my opinion, everything that the police did or failed to do and that Burton did or failed to do must be considered with the coercive potential of the situation firmly in mind.

The detectives who conducted this search were not born yesterday. They were surely aware that it would not be easy, within the confines of that bus, for a passenger to defy them and to withhold his consent.[3] Detective Oxendine testified that she did not advise Burton of his right to terminate the discussion without answering her questions because "the law says I don't have to tell him, so no, I didn't tell him." Obviously, she did not want to make such defiance any easier. Detective Hairston likewise stated that he did not tell Burton that he was not required to consent to the search.

There was a meaningful message in the detectives' failure to apprise Burton of his rights. In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court sustained the search of a woman at an airport, largely because the officers had carefully advised her of her rights. The Court stated that

---

**1.** Whether a defendant's consent to a search was voluntary is "a question of fact to be determined from all of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). Nevertheless, once the evidentiary facts have been found, the appellate court must deal with their legal consequences, particularly where, as here, constitutional rights are at stake and a novel legal issue is raised. *Cf. Griffin v. United States*, 618 A.2d 114, 117–18 (D.C.1992). See also note 9, *infra*.

**2.** I recognize that the judge ultimately found that Burton consented to the search with a "definite and unambiguous voluntary statement." Evi-

dently, the judge viewed the environment as coercive, but not coercive enough to invalidate the search. *Cf. In re J.M.*, 619 A.2d 497, 502 (D.C. 1992) (en banc).

**3.** In *United States v. Felder*, 732 F.Supp. 204 (D.D.C.1990), another detective from the Metropolitan Police Department's Drug Interdiction Unit testified that he had interviewed approximately 50 passengers on board buses and about 35 on board trains. Of those 85, only 3 or 4 had refused to consent to an interview. He also stated that "when passengers who appear nervous refuse to consent to an interview, certain members of his unit then take it upon themselves to notify authorities at the next stop." *Id.* at 205.

it is especially significant that the respondent was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require "proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search," [*Schneckloth v. Bustamonte,* 412 U.S. 218], at 234 [93 S.Ct. 2041, 2051, 36 L.Ed.2d 854] [1973] (footnote omitted), such knowledge was highly relevant to the determination that there had been consent. And, perhaps more important for present purposes, *the fact that the officers themselves informed the respondent that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.*

*Id.* at 558–59, 100 S.Ct. at 1879 (emphasis added). In *In re J.M., supra* note 2, 619 A.2d at 503, this court, quoting from *Mendenhall,* also recognized the significance, in appraising the voluntariness of a defendant's consent, of the police having advised (or failed to advise) him of his rights.

The converse of the last sentence of the quoted passage from *Mendenhall* is equally compelling—the detectives' failure in this case to inform Burton that he had the right to refuse to consent was also "especially significant," for it substantially *increased* the probability that the police conduct could reasonably have appeared to him to be coercive. *Mendenhall, supra,* 446 U.S. at 558–59, 100 S.Ct. at 1879–80. Indeed, such a failure on the part of the police to advise a defendant of his right to refuse consent "will sometimes invalidate a consent search because such a warning was necessary to counteract other coercive elements." 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(i), at 213 (2d ed. 1987). As the judge himself remarked, there were substantial coercive elements present here.

## II.

### THE ALLEGED WITHDRAWAL OF CONSENT

According to the accounts of all three witnesses who described the search, Burton's acquiescence in it, by the time the encounter ended, was at best reluctant. Detective Oxendine testified that Burton stuck his hand in his jacket pocket and turned away; he "looked as if he was trying to hide something . . . between the seat and the wall of the bus." According to Ms. Oxendine, Burton "turned toward the window as if he was trying to take [the contraband] out right before Ronnie [Hairston] found it." To a lay observer not schooled in nice legal distinctions, this would surely come across as action designed to thwart a search, not to continue to consent to it. We are supposed to be "earthy" rather than academic in approaching these questions, and to display "hard-nosed realism" too. *See, e.g., Gomez v. United States,* 597 A.2d 884, 889 (D.C.1991) (citation omitted). This "earthy" approach should be available to both parties to the controversy—to defendants as well as to prosecutors and detectives. Common sense tells us that trying to hide something does not constitute, nor is it consistent with, continued consent to a search in which the incriminating item sought to be concealed would inevitably be found.

Detective Hairston's account is likewise hard to reconcile with the notion that Burton was still "freely" consenting to a search which, if successfully completed, would all but inevitably land him in the penitentiary for many years to come. According to Hairston, Burton grabbed his jacket as Hairston was about to search him. Burton also looked away, out of the window. Burton's hand was in his jacket until Hairston "asked" him to remove it, which Burton did. At this point, according to the detective, he had seen a "bulge," and he was "thinking about my safety because I thought there might be a weapon in his pocket."

The idea that Burton might be about to pull a revolver or other weapon on an officer cannot easily be squared with the perception that he was at that time making or adhering to a free and unconstrained choice to submit to a search. To adopt the sensible words spoken on the subject by the trial judge shortly after he heard the evidence, "I think

that if a ... police officer believes that someone who has previously given consent is now going actually for a weapon that potentially is going to be used to injure the officers, I think conceivably that even lends more credence to the conclusion that the officer should have known that consent was no longer being given."

Burton testified even more directly that he was trying to communicate to the detective his objection to the proposed search:

> Q  Well did you just sit there and let him search you?  Or did you move away?
>
> A  ... I moved toward the window like this.
>
> Q  And when you made that movement, those movements, in your mind were you telling him that you wanted to be searched?  Or telling him that you didn't want to be searched?
>
> A  Telling him I didn't want to be searched.[4]

Given these accounts provided by the participants, it is pretty obvious that by the time Detective Hairston told him to take his hand out of his pocket, Burton did not want Hairston to search him.  His continued consent to the search, if such continued consent existed, was not "the product of an essentially free and unconstrained choice by its maker." *Schneckloth, supra*, 412 U.S. at 225, 93 S.Ct. at 2047.  If Burton nevertheless "consented," he did so because he felt, rightly or wrongly, that he had no choice, and that the consequences of not consenting would be so unfavorable to him that he had better submit to Hairston's wishes, even if this meant that the detective would find the crack.

I do not read either the trial judge's findings or the majority opinion as holding that Burton had any other motivation for his continued "consent," and I do not see how any

reasonable trier of fact could come up with any explanation other than apprehension of consequences even worse than the discovery of the cocaine.  Nevertheless, the trial judge held, and my colleagues agree, that the search was legal because Burton initially consented to it and because he never "unequivocally" withdrew his consent.  I now turn to these issues.

## III.

### LEGAL DISCUSSION

The government freely concedes that the search of Burton was made without a warrant.  Detective Oxendine also acknowledged that, at the time she approached Burton, she had no information suggesting that he was transporting unlawful drugs or that he was engaged in any other unlawful activity.  Obviously, she was without probable cause to arrest or search Burton and lacked articulable suspicion to detain him.  Warrantless searches and seizures conducted under these circumstances are *"per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

A search conducted in conformity with an individual's free and unconstrained consent falls within one of these exceptions. *Schneckloth, supra,* 412 U.S. at 219, 93 S.Ct. at 2043–44.  Where the prosecution claims that the defendant has consented to a search, however, it must prove that there was no duress or coercion, express or implied.  *Judd v. United States,* 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951).  In this jurisdiction, "clear and positive testimony" has been required.  *Id.*[5]  Our courts have also long rec-

---

4.  On cross-examination, Burton was asked the somewhat surrealistic question whether he pushed Detective Hairston away during the encounter, apparently in order to indicate that he did not wish to be searched.  On redirect examination, Burton explained why he did not push Hairston:

> "It would have got me locked up.  Might have gotten me beaten up."

At least in my view, Burton's answer was quite a bit "earthier" than the apparent assumption

upon which the prosecutor's question was predicated.

5.  In *Oliver v. United States,* 618 A.2d 705, 709 (D.C.1993), we stated that "[t]he government bears the burden of proving voluntary consent by a preponderance of the evidence."  We cited *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968) and *United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974).  In *Bumper,* the Court said nothing explicit about

ognized that a measure of implicit duress is likely to be present whenever officers demand the right to search a citizen or his home. *Id.* (citations omitted); *see also Higgins v. United States*, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954).[6] More recently, while acknowledging that duress is not the only plausible inference to be drawn from a suspect's consent to police action which is likely to result in his apprehension, we have noted that "one would ordinarily presume that most individuals would not voluntarily act in such a manner as to virtually seal their own doom." *Lawrence v. United States*, 566 A.2d 57, 63 n. 12 (D.C.1989).

The pressure to accommodate the police is powerful, especially in circumstances such as those here. As Professor LaFave has explained,

[g]iven the fact that the other bus passengers are unlikely to be similarly uncooperative and that it will be generally understood that persons approached by police "normally accede to the police officer's request," such stonewalling would be perceived by the reasonable person (quite correctly) as a course which would make him an object of suspicion and thus a subject of

further attention by the police team involved in the sweep or by officers at subsequent stops. In this respect, such flat-out refusal to cooperate with the police is quite different from the more neutral response available to a person confronted by police "in an open and public space," which is "to walk away or to ignore questions addressed to him." Also, in light of the show of authority involved in undertaking a bus sweep, the dynamics of the situation make a nonconforming refusal to cooperate an especially unlikely choice. That this is so is ineluctably apparent when it is considered that "such means of transportation are utilized largely by the underclass of this nation who, because of greater concerns (such as being able to survive), do not often complain about such deprivations."

3 LaFave, *supra*, § 9.2A, at 120 (Supp.1993) (footnotes omitted). In the present case, as I have explained, the trial judge recognized, essentially for the reasons stated by Professor LaFave, that the circumstances before him contained intrinsically coercive elements.

The dispositive question, in my view, is whether the government established that *at*

---

the standard by which the government must prove voluntariness. In a footnote, 391 U.S. at 548 n. 12, 88 S.Ct. at 1792 n. 12, however, the Court cited, *inter alia, Judd,* which required "clear and positive testimony," and *Wren v. United States,* 352 F.2d 617, 618 (10th Cir.1965), in which the court stated that "[i]n order to constitute a voluntary consent it must *clearly* appear that the search was voluntarily permitted." (Emphasis added). *Bumper* seems to reinforce *Judd,* not override it.

In *Matlock,* the Supreme Court found it unnecessary to determine whether the standard of proof imposed on the prosecution by the trial court was unduly strict. 415 U.S. at 177 n. 14, 94 S.Ct. at 996 n. 14. The Court volunteered, by way of dictum, that "[i]n any event, the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *Id.* at 178 n. 14, 94 S.Ct. at 996. Whether this statement could reasonably be viewed as overruling *Judd's* "clear and positive testimony" standard is unclear. Reading *Judd, Bumper, Matlock,* and *Oliver* together, I infer that even if the preponderance of the evidence standard applies, the court must scrutinize the evidence carefully because of the importance of the rights at stake and the obvious potential for coercion.

6. In *Higgins,* the court took this position further than any other decision in this jurisdiction of which I am aware:

But no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered. It follows that when police identify themselves as such, search a room, and find contraband in *it,* the occupant's words or signs of acquiescence in the search, accompanied by denial of guilt, do not show consent; at least in the absence of some extraordinary circumstance....

*Id.* 93 U.S.App.D.C. at 341, 209 F.2d at 820. While this rationale has some common sense appeal, the Supreme Court has subsequently reject[ed] the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions.

*Mendenhall, supra,* 446 U.S. at 555, 100 S.Ct. at 1877 (1980) (Stewart, J., concurring) (citations omitted); *see also Leavitt v. Howard,* 462 F.2d 992, 997 & n. 6 (1st Cir.1972), criticizing *Higgins* and stating that:

[b]owing to events, even if one is not happy about them, is not the same thing as being coerced.

*the time Detective Hairston was conducting the search of Burton's person,* he was doing so with Burton's free and unconstrained consent, and that this consent was secured without duress or coercion, express or implied. One way of approaching that issue is to divide it up, as the majority has done, into two sub-questions, namely: (1) whether Burton's consent was initially freely given; and (2) if so, whether it was subsequently withdrawn. No matter how we frame or subdivide the inquiry, however, the constitutional command is the same: the prosecution must prove that Burton continued to consent freely to the search at the critical moment when Hairston searched him. With due respect to my colleagues, I cannot agree, in light of the judge's comments, that the government proved any such thing.

Proceeding with the two-part inquiry described above and noting the judge's finding that Burton orally agreed to be searched, my colleagues rely heavily on a number of cases which are said to stand for the proposition that the withdrawal of consent must be unequivocal. Most of the decisions relied on by the majority, however, actually hold a good deal less than that, and they shed little if any light on the issue here.[7] Because the government bears the burden of proving consent because it must establish the absence of duress or coercion, express or implied *Judd, supra,* 89 U.S.App.D.C. at 66, 190 F.2d at 651, and because "[t]his burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority," *Bumper, supra* note 5, 391 U.S. at 548–49, 88 S.Ct. at 1792, I am not sure that a requirement that a withdrawal of consent must be unequivocal is consistent with the constitutional command. Such a requirement may not, in any event, be permitted to divert the court from the main issue, namely, whether the government has proved that a truly free and unconstrained consent existed at the time the search was conducted.

But even if I were to assume, *arguendo,* that the "unequivocal withdrawal" require-

---

7. In the first case cited by the majority, *United States v. Alfaro,* 935 F.2d 64 (5th Cir.1991), for example, Alfaro, an employee, had agreed, as a condition of employment, that his employer had the right to search his person and property. When the employer's representatives sought to exercise that right, Alfaro said that he had to go outside to talk to a lieutenant. He never asked not to be searched, nor did he otherwise protest. The court rejected his contention that consent had been withdrawn, observing that "[h]is conduct thus falls far short of an unequivocal act or statement of withdrawal, *something found in most withdrawal of consent cases." Id.* at 67 (emphasis added). The court did not hold that an unequivocal statement was required in order to make a withdrawal effective. It simply noted that such a withdrawal appeared in most cases. So far as one can discern from the opinion, the question whether a withdrawal must be unambiguously communicated was not at issue.

In *State v. French,* 203 Neb. 435, 279 N.W.2d 116 (1979), the next case on which my colleagues rely, the court ordered the fruits of a search suppressed, holding that "the defendant's unequivocal 'no' could only be reasonably interpreted as revoking whatever consent might have previously been given." *Id.* 279 N.W.2d at 119–20. The court thus simply noted that French's withdrawal of consent was unequivocal, and expressed no opinion as to whether it was required to be.

In *United States v. Joseph,* 282 U.S.App.D.C. 102, 892 F.2d 118 (1989), the defendant reached into a bag which an officer was searching with his consent, and asked "Do we have to do this here? ... I have underwear and things in the bag." The court held, quite correctly, that consent had not been withdrawn, *id.* at 106, 892 F.2d at 122, for Joseph's objection was to the place where the search was being conducted, not to the search itself.

*Lawrence v. Commonwealth,* 17 Va.App. 140, 435 S.E.2d 591 (1993) is the only case relied on by the majority in which the factual situation was even remotely comparable to the one before us. In *Lawrence,* the defendant, who had been acting in an extremely suspicious manner, emptied his pockets in response to an officer's request for permission to search him, but claimed that there was nothing in one pocket in which the officer observed a bulge. The officer ultimately placed his hand in Lawrence's pocket and extracted multiple packets of heroin. A majority of the divided court held that Lawrence had not withdrawn his consent, in part because "extreme reluctan[ce]" to facilitate a search is not tantamount to a withdrawal. *Id.* 435 S.E.2d at 594–95.

The present case is distinguishable from *Lawrence* because the search there took place near the entrance to a railroad station—a far less confining and coercive environment than the inside of a bus. In any event, the excellent dissenting opinion by Judge Benton is far more persuasive, at least to me, than the *Lawrence* majority's labored conception that an individual's extreme reluctance to facilitate a search is somehow consistent with consent. As Judge Benton aptly put it, "Lawrence's own removal of items from his pocket were responses inconsistent with a finding of consent to the search." *Id.* at 596.

ment is or should be in force in the District, the government still has not met its burden. When Burton turned away from Hairston, placed his hand in his jacket pocket, and led one detective to believe that he (Burton) was attempting to hide something and the other detective apprehend that he may be reaching for a weapon, his conduct was so incompatible with a continued willingness to be searched that, at least in my view, the prior oral consent had been withdrawn as a matter of law.

Professor LaFave has described, and the trial judge in this case has explicitly recognized, the coercive character of the situation in which Burton found himself. It would have been very difficult, in Burton's position, not to cooperate with the detectives. If Burton's maneuvers, obviously designed to avoid being searched further, were insufficient to communicate that wish, then for all practical purposes nothing short of "hell, no!" to the detectives would have sufficed. But everyone, including the detectives and their prey, knows how hard it is to thwart the wishes of police officers in the situation in which Burton found himself. To require resounding words of defiance would allow only the most fearless or heroic (if not positively foolhardy) passenger to vindicate his constitutional right not to be searched, even though the detectives were without a warrant and without probable cause. Such a rule would make the enjoyment of that right so perilous that few if any citizens would be prepared to take the risk and pay the price.

My colleagues apprehend that unless we insist that a revocation of consent must be more unequivocal than Burton's actions in this case, police officers will not know when they may search and when they may not, so that any more flexible rule will make their lives unduly difficult. Under most circumstances, I would share their concern. Courts should exercise restraint in second-guessing the reactions of police officers who have to make split-second decisions when confronted with dangerous events on the streets.

In my view, however, these considerations have no application here. The police created the underlying situation by setting out to attempt to conduct searches of citizens as to whom they lacked probable cause or even articulable suspicion. They proposed to accomplish this by securing these citizens' consent. That consent would have to be given or refused in an intrinsically coercive environment in which, as the detectives surely knew, it would be very difficult for a passenger to say no. Understandable fear of defying the police was thus used as a substitute for (or arguably a circumvention of) the requirement of probable cause.

Some judges and courts have recoiled from such police tactics, viewing them as more consistent with the practices of despotic regimes than with the institutions and traditions of a free nation. *See, e.g., Florida v. Bostick,* 501 U.S. 429, 442–44, 111 S.Ct. 2382, 2390–91, 115 L.Ed.2d 389 (1991) (Marshall, J., dissenting), and decisions there cited. Whether or not such criticisms are justified,[8] important constitutional rights are at stake, and I do not think that the enjoyment of these rights should be curtailed because an individual under intense pressure seeks to avoid the search by his actions, rather than by making openly defiant proclamations. Where the government relies on consent as a basis for searching a citizen without probable cause in a coercive environment, then the government must be required to prove its case, and any ambiguity should be resolved in favor of the rights of the citizen.

Drug dealers and couriers are not popular, nor do they deserve to be. At least on this occasion, Burton was not the guy in the white hat. To suppress the fruits of this search and others like it would mean that, as a result of our enforcement of the Fourth Amendment, some more crack cocaine or PCP or heroin will get through to a dealer at the end of the bus ride. But to sustain an obviously reluctant "consent" in an intrinsically coercive environment (which was made more so, *inter alia,* by the failure of the police of advise Burton of his rights) is to exact a very high price for the seizure of the drugs.

**8.** "[T]his Court is not empowered to forbid law enforcement practices simply because it consid- ers them distasteful." *Bostick, supra,* 501 U.S. at 439, 111 S.Ct. at 2389.

In my opinion, the Constitution proscribes what the police did here. It is not only drug dealers whose privacy and liberty are compromised when the police obtain "consent" in this manner. Ordinary law-abiding citizens, especially those whose circumstances require them to use buses rather than limousines, will also be subject to the Hobson's choice between surrendering their rights or defying the police. Accordingly, I respectfully dissent.[9]

---

9. Judge FERREN agrees in his concurring opinion, *ante*, at 749, that "the inherently coercive environment makes truly voluntary consent unlikely." He is quite right; the trial judge, who heard the testimony, characterized the situation as inherently coercive. Judge FERREN does not mention this patently reasonable reaction on the part of the judge, but concludes, apparently on the basis of *Schneckloth*, *supra*, that we are compelled to uphold the search in spite of the inherently coercive circumstances.

According to *Schneckloth*, however, Burton's consent to the search may be sustained only if, at the time of the search, that consent was "the product of an essentially free and unconstrained choice by its maker." 412 U.S. at 225, 93 S.Ct. at 2047. The judge recognized upon hearing the testimony that a coercive environment existed. He thus found, for all practical purposes, that Burton's choice was neither "free" nor "unconstrained." The judge nevertheless concluded, evidently as a matter of law, that Burton's consent was valid notwithstanding the inherently coercive environment, and he therefore denied Burton's motion to suppress.

Under these particular circumstances, I cannot agree with Judge FERREN that we are compelled to affirm on the basis of a deferential standard of review. On the contrary, we should heed the judge's common sense description of the situation as he perceived it upon hearing the evidence.