Lawrence L. WARE, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CM–1473.

District of Columbia Court of Appeals.

Argued Feb. 23, 1995.
Decided Feb. 27, 1996.

Deborah L. Harris, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Sima F. Sarrafan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Barbara K. Bracher, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

Appellant Ware was convicted of possession of cocaine, in violation of D.C.Code § 33–541(d) (1990). On appeal he contends that the trial court erred in denying his motion to suppress the cocaine seized from him by the police. We disagree and accordingly affirm the conviction.

## I

On June 18, 1993, at about 4:45 p.m., Metropolitan Police Officer Robert Jones was stopped on the street by a woman who said that a man who had just ridden past on a bicycle was selling drugs out of a woman's purse.[1] According to Officer Jones, the woman described a man wearing bicycle shorts, sneakers, no shirt, and no socks. The officer had just seen appellant Ware standing on the sidewalk in front of a house nearby on Ontario Road, talking to someone. Ware was carrying a woman's purse, was on a bicycle, and in all other respects matched the woman's description.

After calling his partner on the radio for backup assistance, Officer Jones alighted from his motorcycle and approached Ware, all the while staring at the purse. Before the officer had a chance to say anything, Ware remarked, "I bet you're wondering why I got a female's purse," to which the officer replied, "Yeah, I am wondering." Ware then asked Officer Jones if he wanted to look inside the purse, but Jones declined because he was waiting for his partner to arrive. Instead of examining the purse, Jones directed Ware to get off his bicycle, put the purse down, and keep his hands out in the open where he could see them. Ware did as he was told, but he kept the purse beside him by placing it on top of a brick wall.

When Jones' partner, Officer Noral Harvey, arrived about a minute later, Ware picked the purse back up and told the officers they could look inside it. He did not hand the purse to the officers, however, but gave them only a quick glimpse of the interior. Then he began to empty the purse, placing several items on the brick wall next to where he was standing. Among the objects he removed were a toothbrush holder and a few clumps of sage. While Ware continued to take things out of the purse, Officer Jones picked up the toothbrush hold-

er, opened it, and found a rock of crack cocaine inside. He did not immediately reveal this discovery either to Ware or to Officer Harvey, however, because he wanted to see what other drugs Ware might have in his possession.

Initially, Ware refused to show the officers the interior compartments of the purse and became "very nervous" and "fidgety" each time Officer Jones reached for it. After Ware had emptied most of the purse, Jones asked Ware if he could look at the purse himself, but Ware remained apprehensive and would not let go of it; as Officer Jones grabbed one handle of the purse, Ware held on to the other. Finally, Officer Jones took the purse away from Ware and looked inside it, where he discovered two loose rocks of crack cocaine, one in the main compartment and one in a side compartment.

In his motion to suppress evidence, Ware argued that he was under arrest at the time he submitted to the search. Since the officers did not then have probable cause to arrest him, he claimed that the cocaine recovered from the purse was the fruit of an illegal search. The government, on the other hand, asserted that Ware was never seized, that he had initiated the conversation with Officer Jones, had voluntarily consented to the search of the purse, and was free to leave at any time since he was approached on a public street. The only real issue, according to the government, was whether the scope of the consent given by Ware reasonably extended to Officer Jones' search of the toothbrush holder.

After hearing the testimony of Officer Jones (which we have summarized) and the arguments of counsel, the trial court denied the motion to suppress. The court ruled that Ware did not consent to a search of the purse because it was clear that Ware wanted

1. According to Officer Jones, the woman flagged him down as he was patrolling Ontario Road on his motorcycle. The officer "could see that she wanted something," but she indicated by gestures that she did not want him to approach her. Jones then rode around the corner onto Columbia Road, and the woman followed him. She then told Officer Jones that a man on a bicycle, whom she described, was selling cocaine out of a black purse. When the officer asked the woman how she knew the man was selling drugs, she replied, "He's out there every day selling drugs." The woman did not identify herself, and the officer never saw her again and never found out who she was.

to control what the police officers saw.[2] However, by taking certain objects out of the purse and placing them in the open, Ware did consent to a search of those items.[3] The court explained:

> It's true the defendant did not tell the officer that he could look inside the toothbrush container. However, the defendant, by taking the container out of the purse and placing it on the wall along with the other items like the sage that were sitting out there in plain view, by that action gave the officer permission to look inside those items or to look at those items.

Because Ware had consented to the search of the toothbrush holder, the court further held that the subsequent search of Ware's purse was supported by probable cause, based on the discovery of the cocaine in the toothbrush holder.

The evidence at trial was substantially the same as that presented at the suppression hearing. In addition to Officer Jones, the government called Officer Harvey and Detective Charles Culver, who testified as to the quantity of cocaine seized and the police procedures for safeguarding seized drugs. The defense did not present any evidence.

## II

Ware maintains that his Fourth Amendment rights were violated when the officers removed the cocaine from the toothbrush holder and the purse. He first contends that the cocaine should have been suppressed as the fruit of an illegal seizure of his person without probable cause.[4] Ware also argues that the subsequent search of the toothbrush holder by the officers exceeded the scope of his consent, which, according to him, was limited to those objects that he wanted the officers to see. We agree with Ware that he was seized within the meaning of the Fourth Amendment, but we hold that this seizure was lawful. We also hold that the subsequent warrantless search of the toothbrush holder did not exceed the scope of Ware's consent.

In deciding whether Ware was unlawfully seized, our inquiry is in two parts:

> First, we must determine whether appellant was "seized" within the meaning of the Fourth Amendment. And second, if appellant was in fact "seized," we must determine whether there was "articulable suspicion" or probable cause of criminal activity, or some other legal basis for the seizure.

*Hawkins v. United States,* 663 A.2d 1221, 1225 (D.C.1995). We consider these questions in turn.

### A. *Was appellant seized?*

 According to Ware, an unreasonable seizure occurred when Officer Jones (1) approached him on his motorcycle and in uniform, (2) ordered him to get off his bicycle, put the purse down, and keep his hands where he could see them, and (3) radioed for backup assistance. The government argues, in response, that Ware was not seized until much later, well after probable cause had been established by the discovery of the cocaine in the toothbrush holder. Under the government's theory, Ware was not seized at first because he was free to leave, and because he initiated the voluntary search. We disagree with the government and hold that Ware was seized within the meaning of the

---

**2.** This conclusion appears to have been based on Ware's actions, rather than his words, for Officer Jones testified that Ware opened his purse and told the officers they could "look in the purse and he would help [them] out and take everything out of it."

**3.** In so ruling, the court rejected Ware's argument that he did not consent to a search of the items taken out of the purse. The court stated:

> Now, it makes no sense under the facts as described by [Officer Jones] that the defendant is taking out of the purse the things he does

not want the police to see. Rather, it's obvious that the defendant is controlling what he wants the police to see by taking out certain items and putting them on a wall. He's leaving other items inside the bag.

**4.** The legality of the seizure of his person was raised by Ware during the suppression hearing, but the trial court did not expressly rule on that point. Instead, the court held that Ware had voluntarily consented to the search of the toothbrush holder and the other items that he had placed on top of the brick wall.

Fourth Amendment.[5]

In *In re J.M.*, 619 A.2d 497 (D.C.1992) (en banc), we stated:

> The crucial test for determining whether a person has been seized is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a *reasonable person* that he was not at liberty to ignore the police presence and go about his business.

*Id.* at 499–500 (citing *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (internal quotation marks omitted; emphasis added in *J.M.*)). Thus the case law makes clear that "[a] seizure does not occur simply because police officers approach an individual and ask a few questions." *Oliver v. United States*, 618 A.2d 705, 708 (D.C.1993).[6] More is required, as we explained in *Kelly v. United States*, 580 A.2d 1282 (D.C.1990):

> Factors which "might indicate a seizure" would include, for example, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*Id.* at 1286 (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.));[7] *see also In re J.M., supra*, 619 A.2d at 502.

Applying these factors in the present case, we conclude that the police encounter with Mr. Ware constituted a seizure. The government emphasizes that Ware initiated the conversation and that he was free to walk away because the encounter took place on a public street. *See, e.g., Oliver, supra*, 618 A.2d at 708 (no seizure occurred when officers approached appellant and asked questions; "[h]e involved himself in a consensual discussion, from which he was free to extricate himself at any moment"). However, Ware began the conversation only after he was approached by an officer[8] who told him in an authoritative manner to get off his bicycle, put the purse down, and keep his hands out in the open. This, in our view, was a "show of authority" of the sort discussed by the Supreme Court in *California v. Hodari D.*,

---

5. We conclude, however, that the seizure was only a "stop" as that term is used in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and not a full-fledged arrest. *See In re M.E.B.*, 638 A.2d 1123, 1126–1127 (D.C.1993).

6. *Accord, Florida v. Bostick, supra*, 501 U.S. at 435, 111 S.Ct. at 2386 (no seizure occurs when police ask questions of an individual, ask to see his identification, and request consent to search his luggage, "as long as the police do not convey a message that compliance with their requests is required"); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen"); *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) ("police questioning, by itself, is unlikely to result in a Fourth Amendment violation"); *Symes v. United States*, 633 A.2d 51, 53 (D.C.1993) ("The Supreme Court ... has made clear that when police officers approach individuals to ask questions, such encounters do not necessarily constitute a seizure"); *Kelly v. United States*, 580 A.2d 1282, 1286 (D.C.1990) ("There must be more than

mere questioning before a court will find that a seizure has occurred"); *Richardson v. United States*, 520 A.2d 692, 696 (D.C.), *cert. denied*, 484 U.S. 917, 108 S.Ct. 267, 98 L.Ed.2d 224 (1987); *United States v. Barnes*, 496 A.2d 1040, 1044–1045 (D.C.1985); *United States v. Smith*, 284 U.S.App.D.C. 64, 66, 901 F.2d 1116, 1118 ("an encounter between a police officer and a citizen, involving no more than approach, questioning, and official identification, does not constitute a seizure"), *cert. denied*, 498 U.S. 863, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990).

7. Although Justice Stewart wrote only for himself and one other Justice in *Mendenhall*, his test for determining whether a seizure of a person has occurred has been adopted in later cases by the Supreme Court as a whole. *See, e.g., Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *INS v. Delgado, supra* note 6, 466 U.S. at 215, 104 S.Ct. at 1762.

8. Ware plainly knew that Jones was a police officer, since he was in uniform and riding a police motorcycle. That knowledge alone, however, *does not mean that the officer's mere approach* constituted a seizure. We have specifically rejected the argument "that police officers are inherently figures of authority, and that their presence results in non-consensual encounters." *Kelly, supra*, 580 A.2d at 1285.

499 U.S. 621, 626–629, 111 S.Ct. 1547, 1550–1552, 113 L.Ed.2d 690 (1991), and Ware's submission to it resulted in a seizure of his person. *Id.* at 626, 111 S.Ct. at 1550–1551. The totality of these events "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick, supra,* 501 U.S. at 437, 111 S.Ct. at 2387 (citation and internal quotation marks omitted).

## B. *Was the seizure lawful?*

Having concluded that Ware was seized, "we must [now] determine whether there was 'articulable suspicion' or probable cause of criminal activity, or some other legal basis for the seizure." *Hawkins, supra,* 663 A.2d at 1225. Ware argues that the anonymous tip that prompted the officer to act was unreliable and hence insufficient to arouse a reasonable suspicion "that criminal activity [was] afoot." *Terry v. Ohio, supra* note 5, 392 U.S. at 30, 88 S.Ct. at 1884. According to Ware, the tip from the unidentified woman amounted, at most, to a mere rumor of past criminal activity.

■ We said in *Peay v. United States,* 597 A.2d 1318 (D.C.1991) (en banc):

To justify an investigative detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. This "minimal level of objective justification" is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In determining whether a *Terry* stop is lawful, the court must look to the "totality of the circumstances." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Even if each specific act by a suspect could be perceived in isolation as an innocent act, "the observing police officer may see a combination of facts that

make out an articulable suspicion." *United States v. Bennett,* 514 A.2d 414, 416 (D.C.1986).

*Id.* at 1319–1320. Under this standard, "[t]he requirement of 'articulable suspicion' is not an onerous one." *Gomez v. United States,* 597 A.2d 884, 888 (D.C.1991). Thus the government argues that if Ware was seized by Officer Jones, that seizure was a permissible *Terry* stop (see note 5, *supra*), supported by articulable suspicion based on an anonymous, but corroborated, tip from a citizen.

On several occasions we have held that "[t]he requisite articulable suspicion for the stop can be furnished by an anonymous tip, and the police may stop a suspect after promptly corroborating innocent details of the tip without first observing illegal conduct." *Holston v. United States,* 633 A.2d 378, 381 (D.C.1993) (citations omitted); *accord, e.g., United States v. Johnson,* 540 A.2d 1090, 1092 (D.C.1988); *Allen v. United States,* 496 A.2d 1046, 1049 (D.C.1985); *United States v. Mason,* 450 A.2d 464, 466 (D.C. 1982) (upholding *Terry* stop based on anonymous tip "where all innocent details have been quickly corroborated on the scene"). The Supreme Court has similarly held "that under the totality of the circumstances [an] anonymous tip, as corroborated, [can exhibit] sufficient indicia of reliability to justify [an] investigatory stop...." *Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990).

■ Because there are obvious risks in relying indiscriminately on anonymous tips from citizens to justify *Terry* stops, we have emphasized that each case "must be carefully evaluated on its facts," and that an anonymous tip must be supported by "sufficient corroboration" in order to avoid abuse of the *Terry* doctrine. *Johnson, supra,* 540 A.2d at 1091; *see Alabama v. White, supra,* 496 U.S. at 332, 110 S.Ct. at 2417 (upholding *Terry* stop when "significant aspects of the [anonymous tip] were verified"); *Brown v. United States,* 590 A.2d 1008, 1015 (D.C.1991) ("courts are properly wary of sustaining seizures on the basis of anonymous tips, and require a substantial measure of corroboration of information"). Since *Illinois v. Gates,*

462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), this court has adopted a "totality of the circumstances" test when determining the reliability of information received from anonymous sources. *See, e.g., Gomez, supra,* 597 A.2d at 889; *Brown, supra,* 590 A.2d at 1014.[9] In the instant case, as in most cases, this test requires us to consider

> the informant's credibility and reliability and the basis for his or her knowledge, ... the sufficiency of the informant's description and the degree to which [Ware] matched it, as well as [Ware's] conduct on the scene and any inferences that may fairly be drawn from that.

*Id.* at 1014–1015. To this list we must add, as circumstances warrant, "the facts known to the officers from personal observation," *Alabama v. White, supra,* 496 U.S. at 330, 110 S.Ct. at 2416, the amount of time between receipt of the tip and the officer's independent corroboration, *Holston, supra,* 633 A.2d at 381, and the tipster's ability to predict future behavior of the suspect. *Illinois v. Gates, supra,* 462 U.S. at 245, 103 S.Ct. at 2335–2336.[10]

▆▆▆ Applying these standards, we hold that the anonymous tip that Officer Jones

received was sufficiently corroborated. While we agree with Ware that it is difficult to assess the tipster's credibility, *see Brown, supra,* 590 A.2d at 1015, this court has "long recognized a 'presum[ption] that a citizen is prima facie a more credible source than a paid police informant.'" *Allen v. United States, supra,* 496 A.2d at 1048 (citing *Rushing v. United States,* 381 A.2d 252, 255 (D.C. 1977)). We have also said that when a citizen appears to have personally observed a crime, "the reliability of his or her information is greatly enhanced." *Allen, supra,* 496 A.2d at 1048 (citations omitted).[11] Finally, the fact that the tip was given in person, rather than over the telephone, further strengthens its credibility. *See Brown, supra,* 590 A.2d at 1016 ("an anonymous telephone tip is of the 'weakest reliability'"); *Lawson v. United States,* 360 A.2d 38, 40 (D.C.1976) ("there may be cause to make [the] distinction in some circumstances" between anonymous tips received in person and those received by telephone).[12]

We note also that the details of the tip were corroborated by the officer's own observations. The woman gave information that precisely identified Ware's outfit and his

**9.** The "totality of the circumstances" test was originally designed for evaluating anonymous tips used to establish probable cause to make an arrest. *See Illinois v. Gates, supra,* 462 U.S. at 230, 103 S.Ct. at 2328. More recently, however, the Supreme Court extended this test to *Terry* stops in *Alabama v. White, supra,* 496 U.S. at 330–331, 110 S.Ct. at 2416–2417. Thus, in order to establish reasonable suspicion in anonymous informant cases, we must examine the quality and quantity of the information available to the police in light of the totality of the circumstances. *Id.* at 330, 110 S.Ct. at 2416. In this respect, the only difference between a *Terry* stop and a full-fledged arrest is in "the level of suspicion that must be established." *Id.* at 331, 110 S.Ct. at 2416.

**10.** We caution, however, that the ability of the informant to predict future events "has no 'talismanic quality;' other kinds of corroboration may be sufficient." *Gomez, supra,* 597 A.2d at 889 n. 9 (citations omitted). Such predictions of future behavior merely show that the informant has "inside information—a special familiarity with [the suspect's] affairs." *Alabama v. White, supra,* 496 U.S. at 332, 110 S.Ct. at 2417.

**11.** While it is not entirely clear that the woman had personally witnessed the drug activity she reported to Officer Jones, she did tell the officer

that Ware was "out there every day selling drugs," thus suggesting that she had more than a passing acquaintance with Ware's activities. For this reason "we may assume that the anonymous [informant] possessed citizen-eyewitness status and hence that her report had reliability beyond that accorded a tip from a caller whose basis of knowledge is wholly unknown." *Cauthen v. United States,* 592 A.2d 1021, 1023 (D.C.1991).

**12.** Ware argues that the tip was unreliable because it failed to predict his future behavior. We rejected essentially the same argument in *Cauthen, supra* note 11:

> [*Alabama v.*] *White* is not directly in point because the government does not rely here on the [tipster's] "insider" status to confirm her basis of knowledge; rather, it characterized her as an eyewitness informant, and we have conceded some merit to that position. *White* establishes no mandatory condition that a tip predict future activity to be reliable ... but stresses the decisiveness of such information where otherwise there is nothing from which a court can "conclude that [the informant] is either honest or his information reliable."

592 A.2d at 1025 (citations omitted).

method of drug distribution. She described the drug dealer as wearing bicycle shorts, sneakers, no shirt, and no socks. She also said that the man was selling drugs out of a woman's purse. Officer Jones had just seen Ware in an outfit that matched the woman's description. Moreover, as the officer approached him, Ware blurted out, "I bet you're wondering why I got a female's purse." These corroborative details, in our view, gave the anonymous tip sufficient reliability to support the officer's reasonable suspicion of criminal activity.

Ware relies heavily on the *Brown* case, in which this court held that an anonymous tip had not been sufficiently corroborated to provide articulable suspicion. We find both *Brown* and *Cauthen v. United States,* which reached a similar result, to be distinguishable. In *Brown* the information given to the police by telephone identified the defendant only as a black man wearing blue jeans and a white shirt with writing on the front. Besides finding this description deficient, we noted that "Brown's actual appearance failed to match the few details which the tipster did provide." 590 A.2d at 1023 n. 23. Similarly, in *Cauthen* we found the content of the anonymous tip to be inadequate because there was no physical description at all, and no other information that the police could rely on:

> The tip stated that three or four persons were [at a certain location] selling drugs. Other than describing the number of participants, it gave no physical description of the suspects by sex, race, size, clothing or any other distinguishing feature; nor did it describe any object, such as a car or storefront, in the vicinity of which they could be located.

*Cauthen, supra* note 11, 592 A.2d at 1023 (footnotes omitted). In each case we also held that there was insufficient corroboration to overcome the weakness of the tip itself. In *Brown* there was "no corroboration of any prediction of future conduct, the description of the seller was scanty, and the match-up between that description and Brown's appearance was in some measure flawed," 590 A.2d at 1023, and in *Cauthen* we were troubled by "the delay of at least fifteen minutes

in the arrival of the police at the reported location," a delay which we deemed a "key factor" in the circumstances of the case. 592 A.2d at 1023. In the instant case, however, we are satisfied that both the tip itself and the corroborating information are considerably stronger than in either *Brown* or *Cauthen. See also Speight v. United States,* 671 A.2d 442, 447–448 (D.C.1996) (distinguishing *Brown* and *Cauthen* ).

For these reasons we hold that the anonymous tip, corroborated by Officer Jones' personal observations, gave the officer a reasonable suspicion that appellant Ware was engaged or about to engage in criminal conduct, and that his seizure of Ware's person therefore did not violate the Fourth Amendment.

### III

We turn to the final issue in this case: whether the warrantless search of Ware's toothbrush holder was within the scope of his consent. We hold that it was.

 It is firmly established in the law that "[w]arrantless searches are *per se* unreasonable, subject 'to a few specifically established and well-delineated exceptions.'" *Burton v. United States,* 657 A.2d 741, 745 (D.C.1994) (citing *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Busta-monte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–2044, 36 L.Ed.2d 854 (1973) (citations omitted). Ware concedes that he "consent[ed] to have the officer look at his objects as they lay on the wall (with no cocaine visible)." He claims, however, that Officer Jones overstepped his consensual authority when he looked inside the toothbrush holder. While we agree with Ware that he limited his consent to those items that he placed on top of the wall, we disagree with his contention that this limited consent barred Officer Jones from examining the insides of those items.

 On this issue we are guided by the Supreme Court's decision in *Florida v. Jime-*

*no,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), in which the Court held that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251, 111 S.Ct. at 1803–1804 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 183–189, 110 S.Ct. 2793, 2798–2802, 111 L.Ed.2d 148 (1990)); *accord, Burton v. United States, supra,* 657 A.2d at 746 (citing *Jimeno* ). The Court further explained:

> A suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization.

*Jimeno,* 500 U.S. at 252, 111 S.Ct. at 1804; *see Burton,* 657 A.2d at 746. The rule which flows from these principles is that "[t]he scope of a search is generally defined by its expressed object." *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1804 (citation omitted).

 The Supreme Court in *Jimeno* did not say in so many words that the object of the search must be "expressed" directly to the person from whom consent is sought. Assuming, without deciding, that this is a requirement, we do not think the officers' failure to "express" the object of their search to Mr. Ware renders his consent invalid. That is only one factor, among all the others, that we must consider in assessing its validity, just as we do in deciding whether the consent was voluntary:

> [T]he government is not required to establish that a defendant knew that he or she had a right to withhold consent in order to uphold a finding that a consent to search was voluntary.... Rather, the government must establish in the totality of the circumstances that consent was, in fact, freely given.

*Burton, supra,* 657 A.2d at 745 (citations and footnote omitted); *see Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. at 2047.

The "totality of the circumstances" here shows that Ware initially said he would let the officers "look in the purse and he would help [them] out and take everything out of it." Very soon, however, it became apparent from Ware's conduct that he chose to "delimit ... the scope of the search to which he consent[ed]." *Jimeno,* 500 U.S. at 252, 111 S.Ct. at 1804. He held the purse close to him and would not let go of it when Officer Jones tried to grab it. His actions demonstrated that he did not want the purse itself searched, but at the same time he was willing to expose to the officers' view those objects that he laid on top of the wall. Though Ware thus limited the scope of the search, we think it was reasonable nevertheless for the officers to believe that they had permission to search those items that he had placed on the wall, and that only the purse was off limits. Since under *Jimeno* the test for determining the scope of consent is objective reasonableness, not the subjective intent of the consenting party, we hold that the officers were under no obligation to seek "a more explicit authorization" from Ware. *Jimeno, supra,* 500 U.S. at 252, 111 S.Ct. at 1804.

 Because the officers had Ware's consent to search those objects that were placed on top of the wall, we reject Ware's argument that Officer Jones exceeded the scope of the consent when he looked inside the toothbrush holder. In *Kelly v. United States, supra,* we adopted the holding of the United States Court of Appeals in another case involving the search of a container:

> [V]alid consent, unwithdrawn, to search a container, extends to a search of other containers found therein, at least where the inner container is such that it could contain the object of the search. A paper bag within a suitcase is as likely to contain drugs as the luggage itself.

*United States v. Smith, supra* note 6, 284 U.S.App.D.C. at 67, 901 F.2d at 1119, cited in *Kelly,* 580 A.2d at 1289; *accord, United States v. Springs,* 290 U.S.App.D.C. 273, 277, 936 F.2d 1330, 1334 (1991) (consent to search tote bag included consent to open baby-powder container inside bag); *United States v. Battista,* 278 U.S.App.D.C. 16, 22–23, 876 F.2d 201, 207–208 (1989) (consent to search

suitcase included consent to search plastic bag wrapped in a pair of blue jeans inside suitcase; seizure of narcotics inside another container inside plastic bag upheld).[13] Under *Kelly* and the authorities on which it relies, we hold that Ware consented to a search of not only the outside but also the inside of the toothbrush holder.

 To summarize, then, we hold that Ware did not consent to a search of his purse, but that he did consent to a search of those items which he removed from the purse and laid on top of the wall. His consent to examine the toothbrush holder extended to the interior as well as the exterior of that container. When Officer Jones found a rock of crack cocaine inside the toothbrush holder, he had probable cause to arrest Ware and to search the purse incident to that arrest. Since neither the search of the purse nor the search of the toothbrush holder nor the preceding seizure of Ware's person violated his Fourth Amendment rights, it follows that the trial court committed no error in denying his motion to suppress. His conviction is therefore

*Affirmed.*

---

**13.** As we noted in *Kelly,* 580 A.2d at 1289 n. 7, *Smith* cites *Battista* as "controlling" on the issue of "whether consent to search one container extends to searches of opaque sub-containers found therein." 284 U.S.App.D.C. at 66, 901 F.2d at 1118. "*Battista* makes clear that such a search must be conducted 'within reasonable limits, as was necessary to uncover this particular contraband.'" *Kelly, supra,* 580 A.2d at 1289 n. 7 (citing *Battista* ). Having adopted the holdings of *Smith* and *Battista,* we also adopted this caveat as well.