*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-210

MARCUS C. FORD, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-2959-16)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued September 26, 2018                    Decided February 25, 2021)

*Gregory Lipper* for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman* and *Ethan Carroll*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BECKWITH, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* BECKWITH.

Dissenting opinion by *Senior Judge* NEBEKER at page 22.

BECKWITH, *Associate Judge*:    Appellant Marcus Ford encountered four

police officers in the fourth-floor hallway of his apartment building and, after consenting to be searched by one of them, grabbed his pocket and touched the officer's hand to prevent the officer from continuing the search. The officer handcuffed Mr. Ford, resumed the search of Mr. Ford's jeans pockets, and found a vial of PCP and multiple baggies of cocaine inside a rubber or plastic glove. When Mr. Ford moved to suppress that evidence, the trial court ruled that the officer's search was justified because the consensual encounter between Mr. Ford and the officer "never stopped." A jury subsequently convicted Mr. Ford of various drug-related offenses.

On appeal, Mr. Ford primarily argues that the trial court erroneously denied his motion to suppress because Mr. Ford unequivocally revoked his consent to be searched. We agree, and therefore remand the record to allow the trial court to render additional findings and conclusions as to whether the officer had a lawful basis for searching Mr. Ford's pocket.

## I.

### A. The Search

The government presented the following evidence at the suppression hearing. On February 27, 2016, Officer Justin Branson and three other officers were patrolling inside a public housing complex. Officer Branson testified that he

and the other officers had been assigned to patrol this area because of a "high volume of drug trafficking" in the neighborhood surrounding the building. He also said that within the building, he had recently seen "disregarded, empty glass vials" that he believed were "consistent with PCP," as well as other items such as empty Ziploc baggies, which he considered "indicative" of ongoing drug sales and usage in the building. Because of these recent observations, Officer Branson and the other officers conducted a walkthrough of the building.

As the four officers were exiting the stairwell onto the fourth floor, Mr. Ford was coming from the hallway toward the stairwell. Officer Branson testified that Mr. Ford looked "startled" and "very nervous," that his "eyes got big," that he had a "deer in the headlights" look, and that he was "frozen stiff." Mr. Ford did not enter the stairwell, but "started to almost pivot" and "rotate[d] his body away" from Officer Branson "like he was concealing his right side." Officer Branson testified that he entered the hallway and that Mr. Ford "put his right side up against the wall" and was "almost like hugging the wall as [Officer Branson] walk[ed] past him." In Officer Branson's view, Mr. Ford's movements were "unnatural and weird" and it was strange for Mr. Ford to pivot back into the hallway when he had been about to enter the stairwell.

Officer Branson testified that, within the first five seconds of the encounter,

he "noticed in [Mr. Ford's] right front pants pocket an object similar in contour and size [to] a vial of PCP. A one-ounce vial of PCP." Mr. Ford was wearing "average" jeans that were neither overly tight nor baggy, and Officer Branson could "see the object" through these jeans: it was "a bulge like in contour size to a vial of PCP." Officer Branson stated that he "kn[e]w the history" of the building, had seen empty PCP vials in the building's stairwell, and "already had that in mind" when he saw the bulge.

According to Officer Branson, Mr. Ford said he lived in the building and did not have anything illegal on him. Officer Branson testified that at this point, he asked Mr. Ford, "May I search you?" or "May I check you?" and that Mr. Ford responded "Yes." Officer Branson then reached down and touched the bulge that he saw in Mr. Ford's pocket and discerned from this touch that "the object [he] felt was consistent . . . with a glass vial of PCP." Officer Branson testified that he could tell that it was not a Five-Hour Energy bottle because Five-Hour Energy bottles are a "thin plastic," but this bottle "felt like a glass vial." Officer Branson testified that as soon as he felt the bulge, Mr. Ford "immediately reached down and grabbed his pocket to stop [Officer Branson] from going to that pocket." He stated, "Mr. Ford pretty [sic] stopped me, because he reached down and grabs my hand. Grabs his pocket. He kinds [sic] of touched my hand too, as if to stop me. But, at that point, I already I [sic] felt it." "[B]ased on [Mr. Ford's] reaction"—that

"he grabbed and was fearful"—Officer Branson felt "confident" that the bulge was a vial of PCP. He then put handcuffs on Mr. Ford.

Officer Branson removed from Mr. Ford's pocket a one-ounce vial that he said was "inside of a plastic like purple glove or a plastic glove" or "rubber glove" that was "twisted shut." Along with the vial of what proved to be PCP, the glove contained "some 13 in total small Ziploc baggies containing a white rocklike substance," and the officers had to "fish . . . out" the Ziploc bags from the "different fingers" of the glove. Officer Branson also recovered $331 in cash from Mr. Ford's other pocket.

### B.     The Motion to Suppress

Mr. Ford filed a motion to suppress, arguing that the search was unsupported by reasonable suspicion or probable cause. The government's position was that the search was consensual because Mr. Ford did not unequivocally withdraw his consent. But even if Mr. Ford had withdrawn his consent, the government argued, the police were justified in continuing the search because the incriminating aspects of the vial were apparent to Officer Branson based on his experience and training, the area in which the officers were patrolling, and Mr. Ford's "reaction to Officer Branson's touching the vial of PCP through his pants." Finally, the government argued that the additional search of Mr. Ford's pockets after Mr. Ford was arrested

was justified as a search incident to a lawful arrest.

The trial court ruled that Mr. Ford consented to the search and that the search never stopped being consensual. Specifically, the court found that "at the time of the search, as the officer was reaching for Mr. Ford's pocket, Mr. Ford put his hand there; and he[1] grabbed his hand. And cuffed him quickly to get his hand away from there." The court stated that although the search was "interrupted briefly" when Mr. Ford moved his hand, Mr. Ford "never did any of the things that the other cases require to remove himself from the consensual search." While the trial court acknowledged that Mr. Ford "put his hand there and tried to stop him," it concluded that "putting a hand there—is not sufficient under the law to remove yourself" from the search.

As to whether the officers had probable cause for the search, the court viewed it as "very close case," noting that "if we had a nice, hard rock or

---

[1] The trial court did not specify whether "he" was Mr. Ford or Officer Branson. Officer Branson testified that Mr. Ford either grabbed or touched Officer Branson's hand, "as if to stop me," and then Officer Branson testified that he "grabbed . . . [Mr. Ford's] front pants waistband . . . and with my left hand, I kind of grabbed ahold of his hand" to cuff him. Later, Officer Branson said "I don't remember [he] was trying to grab me, but he was like grabbing the pocket like to keep me from going into the pocket." In light of this testimony, and given the trial court's subsequent statement that when a "person starts moving their hands towards their pockets or waist area, that officer are [sic] going to grab their hands and hold them," we infer from this context that the trial court made a factual finding that Officer Branson grabbed Mr. Ford's hand in order to cuff him.

something obviously easily identified as drugs, it would be a better case for the government." The court ultimately declined to "make a ruling one way or the other," focusing instead on its conclusion that Mr. Ford had consented to the search and that "even if he was arrested, and even if he was arrested illegally, it didn't change the search from being consensual."[2]

### C.    Expert Testimony

The government called Detective George Thomas to testify at trial as an expert in "the distribution and use of narcotics," "the packaging of narcotics for street level distribution," "the manner in which narcotics dealers distribute narcotics in the District of Columbia," and "the price for which narcotics are sold at street value." Mr. Ford did not object. To establish a foundation for Detective Thomas's testimony, the government elicited from him that he had worked on "thousands" of narcotics cases, including those involving cocaine and PCP; that he had worked undercover to purchase narcotics approximately one hundred times; that he "ke[pt] current" with drug trafficking patterns and market prices for drugs

---

[2] Though the court did not decide whether the officers had probable cause to search Mr. Ford, it noted some factors that "add[ed] to the circumstances in this case," such as that "there was a lot of drug activity in that very building" that Mr. Ford moved in a way "to kind of hide part of his body," that Officer Branson had "very recently" seen similar vials in the building that were "exactly what they were looking for," and that the officer knew when he "felt" the vial that it was glass rather than a plastic Five-Hour Energy container."

in D.C. by, among other things, getting "out in the streets" and talking with individuals who have been apprehended for using or selling drugs; and that he received "many hours" of formalized training from various law enforcement organizations. Detective Thomas stated that based on those experiences, he was familiar with the "various ways" that cocaine and PCP are packaged and sold in D.C., as well as their relative costs. He also testified that he had read studies and helped prepare reports for law enforcement agencies on "drug trends, prices, and the abuse of drugs . . . ."

Detective Thomas testified that because of the amount of each drug, the packaging, and the cash found on Mr. Ford, he concluded that the vial and zips recovered from Mr. Ford's pocket were consistent with distribution, rather than casual use. He stated that regular users usually buy one to three "dippers" of PCP—cigarettes or cigars dipped into a vial of liquid PCP—and that it would be atypical for a user to carry a full one-ounce vial (which can yield seventy-five to eighty dippers total). Similarly, regular users of cocaine purchase only two or three "zips" at a time. Detective Thomas testified that it is "not common" for a regular user to have a one-ounce vial of PCP and thirteen bags of cocaine at one time like Mr. Ford did. More likely, a person with this quantity and combination of drugs on hand would be a "one-stop-shop" kind of dealer who had "clientele or customers requiring both" types of drugs. Detective Thomas said that if he

believed he was dealing with a mere possession case, he would have "advise[d] the government" accordingly after reviewing the evidence.

After a half day of deliberations, the jury convicted Mr. Ford of various counts related to the possession and distribution of cocaine and liquid PCP.

## II.

Mr. Ford makes three claims on appeal. He first argues that the items Officer Branson found during the search should have been suppressed because he withdrew his consent to be searched and there was otherwise no probable cause for the search. He also argues that the trial court committed plain error in admitting Detective Thomas's expert testimony and further erred in failing to merge the possession of liquid PCP offense with the enhanced charge of PWID PCP. We review each claim in turn.

### A. Consent to Search and Revocation

A search conducted without a warrant is "per se unreasonable" under the Fourth Amendment, subject to "a few specific and well-established exceptions." *Basnueva v. United States*, 874 A.2d 363, 369 (D.C. 2005). An individual's free and voluntary consent to be searched is one such exception to the warrant requirement. *Burton v. United States*, 657 A.2d 741, 745 (D.C. 1994); *Schneckloth*

*v. Bustamonte*, 412 U.S. 218, 219 (1973).  Under this exception, the government must show by a preponderance of the evidence that consent was freely and voluntarily given.  *Basnueva*, 874 A.2d at 369.  Whether an individual's consent is voluntary is a fact-intensive inquiry "to be determined from the totality of all the circumstances."  *Schneckloth*, 412 U.S. at 227.  The test "focus[es] specifically on the consenting person's characteristics and subjective understanding."  *Basnueva*, 874 A.2d at 369; *see also Schneckloth*, 412 U.S. at 229 ("[A]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.").

After a suspect gives free and voluntary consent to be searched, a suspect "may of course delimit as he chooses the scope of the search to which he consents."  *Burton*, 657 A.2d at 746 (quoting *Florida v. Jimeno*, 500 U.S. 248, 252 (1991)).  One's ability to limit the scope of the search includes the option to withdraw consent entirely prior to completion of the search as long as the revocation is "unequivocal."  *Id.* at 746–47.  Unequivocal conduct may be "in the form of either an act, statement, or some combination of the two, that is inconsistent with the consent to the search previously given."  *Id.* at 748.  While we employ a subjective inquiry to determine whether a suspect's initial consent was voluntary, we assess a suspect's withdrawal of consent "on a standard of 'objective' reasonableness" and ask "what would the typical reasonable person

have understood by the exchange between the officer and the suspect?" *Id.* (quoting *Jimeno*, 500 U.S. at 251); *see also Ware v. United States*, 672 A.2d 557, 565 (D.C. 1996) (stating that "the test for determining the scope of consent is objective reasonableness, not the subjective intent of the consenting party"). Because consent is a factual inquiry, we uphold the trial court's consent findings unless clearly erroneous and review questions of law *de novo. Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002).

Mr. Ford argues that he unequivocally revoked his consent to be searched when he placed his hand on his pocket to stop Officer Branson from going any further.[3] To revoke consent, a person must act in a manner "clearly inconsistent with the apparent consent to search." *Burton*, 657 A.2d at 746–47; *see also Sanders v. United States*, 424 F.3d 768, 774–75 (8th Cir. 2005). In *Ware v. United States*, 672 A.2d at 565, an individual who "held [his] purse close to him[self] and would not let go of it when [the officer] tried to grab it" had effectively limited the scope of consent. While Mr. Ware's limit on the scope of consent did not apply to objects he had previously removed from his purse and "expose[d] to the officers' view," his actions conveyed that "he did not want the purse itself searched." *Id.*

---

[3] Mr. Ford does not contest the trial court's finding that Mr. Ford initially gave voluntary consent to the search.

We have also suggested that the act of "pushing [a] detective away" would likely count as an unequivocal revocation, *Burton*, 657 A.2d at 748, and other courts have found revocation where the suspect, after providing consent to a pat-down search, grabbed or pushed an officer's hand away from a pocket, *see, e.g.*, *Sanders*, 424 F.3d at 775 ("[A]t least five times Sanders moved his hands down and prevented [the officer] from searching his pockets. . . .  In the end, the only way [the officer] could complete the 'consensual' search was to place Sanders in handcuffs."); *State v. Smith*, 782 N.W.2d 913, 927 (Neb. 2010) ("Smith indicated that his initial consent to the pat down was being withdrawn . . . by grabbing [the officer's] wrist and later pushing [the officer's] hand away."); *Lowery v. State*, 894 So.2d 1032, 1034 (Fla. Dist. Ct. App. 2005) ("Lowery twice attempted to reach into his pockets at the same time that the officer was attempting to search the pockets."); *Jimenez v. State*, 643 So.2d 70, 72 (Fla. Dist. Ct. App. 1994) ("The defendant withdrew his consent when he twice grabbed the deputy's hand in an apparent attempt to stop the search of the cigarette packs.").

Conversely, we have concluded that where an individual consented to be searched but later put his hand into his left coat pocket, the individual's behavior did not "objectively . . . signify[] withdrawal of consent[.]"  *Burton*, 657 A.2d at 743, 748–49.  In *Burton*, the officer observed Mr. Burton attempt to "extract something from [his] pocket" during the search "and hide it between the seat and

the side of the bus." *Id.* at 743. Without comment, Mr. Burton then complied with the officer's request to remove his hand from his pocket. *Id.* We stated that there were "a number of possible explanations" for Mr. Burton's conduct. *Id.* at 748. A reasonable officer could have viewed it as an attempt to hide contraband or acquire a weapon from between the seat cushions as readily as an attempt to communicate his unwillingness to continue the search. *Id.* Such conduct that "can be construed in many different ways" by a typical, reasonable officer is equivocal, and thus insufficient to revoke consent. *See id.*

In the present case, despite finding that Mr. Ford "put his hand there and tried to stop" the search, the trial court ruled that Mr. Ford's consent to be searched "never stopped," that the law required "some clear statement and some clear action by the defendant," and that "putting a hand" on a pocket was "not sufficient under the law to remove [one]self" from a consensual search. We disagree. An individual has the right to "delimit as he chooses the scope of the search to which he consents," bound only by the requirement that an objectively reasonable officer would have construed his actions as a clear and unambiguous revocation. *Jimeno*, 500 U.S. at 252; *Burton*, 657 A.2d at 743, 748–49; *Ware*, 672 A.2d at 565; *see also United States v. Gray*, 369 F.3d 1024, 1026 (8th Cir. 2004) (stating that "[w]ithdrawal of consent need not be effectuated through particular 'magic words'").

The record supports Mr. Ford's argument that he withdrew consent. Officer Branson's testimony, in particular, shows that he actually believed that Mr. Ford "reached down and grabbed his pocket to stop [him] from going into that pocket." *See also United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006); *cf. DiPasquale v. State*, 406 A.2d 665, 667 n.2 (Md. 1979) ("An officer's factual interpretation is pertinent even if his legal interpretation is not."). After Mr. Ford grabbed the pocket, Officer Branson "grabbed ahold of [Mr. Ford's] front right waistband," "grabbed ahold of his hand," ordered the other officers to handcuff Mr. Ford, and completed the search. On similar facts, the Eighth Circuit reversed the district court's determination that the defendant had not withdrawn consent where his actions had "so interfered with [the officer's] ability to search him he had to be handcuffed." *United States v. Sanders*, 424 F.3d 768, 775 (8th Cir. 2005). "[I]f the suspect has to be handcuffed to prevent interference with a search of his person," the court held, "the search was not consensual." *Id.* We conclude the same here. This case is not like *Burton*, where a reasonable officer could readily conclude that an individual who reaches across his body and into his pocket may draw a weapon, hide contraband, or possibly assist (rather than resist) the officer's search. *Burton*, 657 A.2d at 748–49. Mr. Ford extended his hand over his pocket toward Officer Branson's hand, much like the *Ware* defendant who clutched his purse close to himself in order to convey that the purse was off limits.

*Ware*, 672 A.2d at 565. Consistent with the trial court's observation that Mr. Ford's "hands were there to prevent" the search, Mr. Ford did not engage in any other nonverbal conduct that would indicate mere hesitancy or annoyance with the search. The government argues that Mr. Ford's act of grabbing the outside of his pocket was "ambiguous" and open to multiple interpretations, but we cannot discern any other explanation for Mr. Ford's actions besides his desire to stop the search.

The trial court erred as a matter of law in ruling that Mr. Ford's actions did not revoke consent.[4] An objectively reasonable officer would have understood Mr.

---

[4] The trial court's assumption that an officer's "basic instinct" when a person close by "starts moving their hands towards their pockets or waist area" is "to grab their hands and hold them" does not change our conclusion. Hand movements toward a person's pockets or waist area might in fact give rise to reasonable, articulable, particularized suspicion permitting an officer to conduct a proper protective frisk pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), if those movements signal to the officer that the person is armed and dangerous. *Sanders*, 424 F.3d at 776. *But see Robinson v. United States*, 76 A.3d 329, 335–38 (D.C. 2013) (determining that there was nothing "inherently suspicious or threatening" about the "back and forth" or "side to side" gestures the suspect had made on the outside chest area of his jacket). That is a separate question, however, from whether a reasonable officer would have perceived that Mr. Ford's actions communicated withdrawal of his consent. *Cf. Jackson v. United States*, 805 A.2d 979, 985–86 (D.C. 2002) ("A consensual police encounter may progress to a *Terry* stop. Once the encounter loses its consensual nature, Fourth Amendment scrutiny will be triggered."). Because we have determined that Mr. Ford unequivocally withdrew consent, we need not reach his alternative argument that his voluntary consent necessarily ended when he was handcuffed.

Ford's act of placing his hand on the outside of his pocket exactly as Officer Branson did understand it—an unequivocal withdrawal of consent to be searched.

## B.      Probable Cause

The government argued that Officer Branson's warrantless search of Mr. Ford's pockets was separately supported by probable cause, but the trial court declined to rule "one way or the other" and relied instead on the consent exception to find that the warrantless search was permissible under the Fourth Amendment. In response to the trial court's indication that it would not rule on probable cause, the prosecutor stated that he "had further argument" that he would forgo "as long as you're not making that ruling." The court also did not make definitive findings as to whether Officer Branson's search was justified by other exceptions to the warrant requirement, such as plain feel if it was "immediately apparent" that the item was "obvious contraband" and gave the officer probable cause to seize it, *see Ball v. United States*, 803 A.2d 971, 974–75 (D.C. 2002), or probable cause to *arrest*, which would have justified a search incident to Mr. Ford's arrest, *see United States v. Lewis*, 147 A.3d 236, 245 (D.C. 2016) (en banc).[5]

---

[5] In *Lewis*, the court concluded that a search incident to a lawful arrest, at least during a traffic stop, may take place before the officer has effectuated the arrest. 147 A.3d at 243. Probable cause to arrest must exist before the search, however. *Id.* at 245 (explaining that, under this court's approach, "the search does

Because the trial court did not decide whether Officer Branson had authority to arrest and search and noted this was a "close case," a record remand is in order to allow the court to make adequate findings and to determine in the first instance whether Officer Branson's search of Mr. Ford was justified by a valid exception to the warrant requirement.[6]  *Laniyan v. United States*, 226 A.3d 1146, 1153 (D.C. 2020).

### C.  Expert Testimony

Mr. Ford contends that the trial court committed plain error in concluding that Detective Thomas was qualified to testify as a drug expert because the detective's testimony was not based on reliable methods and principles reliably applied to the facts of this case.  Mr. Ford concedes that his claim is subject to plain error review[7] because he failed to object at trial.  *See, e.g.*, *Jones v. United*

---

not provide any part of the legal justification for the arrest" and that "the arrest must be justified by preexisting probable cause").

[6]  Remand is appropriate where the trial court, after conducting an evidentiary hearing on a motion to suppress, declines to decide issues raised under alternative theories by the parties.  *Cf. Cave v. United States*, 75 A.3d 145, 149 (D.C. 2013) (Newman, J., concurring) ("It behooves the trial judge to rule explicitly on both bases for decision.").

[7]  Under the plain error test for unpreserved errors in a criminal case, the defendant must show "(1) that there was a deviation from a legal rule; (2) that this error was clear and obvious, rather than subject to reasonable dispute;" "(3) that this error affected the defendant's substantial rights;" and (4) that the error affected

*States*, 990 A.2d 970, 980–81 (D.C. 2010) (reviewing unpreserved challenge to expert testimony for plain error).

In 2016, this court adopted Federal Rule of Evidence 702[8] because of the significant advantage it gives trial judges to "focus on the reliability of principles and methods" when making threshold admissibility determinations. *Motorola Inc. v. Murray*, 147 A.3d 751, 757 (D.C. 2016) (en banc). Accordingly, when a party proffers expert testimony, the trial court "must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* at 754 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993)); *id.* at 756 (acknowledging the trial judge's "robust

---

"the fairness, integrity or public reputation of judicial proceedings." *In re Taylor*, 73 A.3d 85, 96 (D.C. 2013) (internal citations and quotation marks omitted).

[8] Federal Rule of Evidence 702 permits a witness to testify as an expert if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Motorola Inc. v. Murray*, 147 A.3d 751, 757 (D.C. 2016) (en banc).

gatekeeping function"). As we recognized in *Motorola*, this gatekeeping requirement applies equally to "testimony based on 'technical' and 'other specialized' knowledge." 147 A.3d at 755 (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999)). Its purpose "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court therefore may not "reflexively admit expert testimony because it has become accustomed to doing so under the *Dyas/Frye* test." *Id.* at 758.

We need not decide whether the trial court erred in admitting Detective Thomas's testimony because if an error indeed occurred,[9] it was not clear or obvious. In order for an error to be plain, it must be "clear under current law." *Williams v. United States*, 210 A.3d 734, 743 (D.C. 2019). Binding cases on the issue will suffice, but "[t]hat there are few judicial precedents directly on point . . .

---

[9] Because Mr. Ford did not object, the trial court did not make findings regarding Detective Thomas's reliability. Under the circumstances of this case, without a record, we cannot decide whether the trial court admitted the testimony in contravention of this court's decision in *Motorola* and we therefore affirm the court's decision on other grounds. *See also State v. Esparza*, 413 S.W.3d 81, 87 (Tex. 2013) ("At trial, the proponent of scientific evidence is not typically called upon to establish its empirical reliability as a predicate to admission unless and until the opponent of that evidence raises an objection under Rule 702.").

does not preclude a finding of clear error . . . ." *Conley v. United States*, 79 A.3d 270, 290 (D.C. 2013). Mr. Ford has not cited a case in this jurisdiction that has held that drug expert testimony does not satisfy the *Motorola* test. The Advisory Committee Notes to Rule 702 instead suggest that the trial court may have acted within its discretion: "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. As Detective Thomas's testimony was based on his years of employment with the Metropolitan Police Department, his experience investigating drug cases and working undercover, and his training in the narcotics field, admitting his testimony was not clear or obvious error because it is not a well-settled legal principle or precedent that such testimony must be excluded. *See Conley*, 79 A.3d at 290. As it is not immediately apparent that the trial court "reflexively" admitted the testimony against *Motorola*'s mandate, we affirm the trial court's decision to admit Detective Thomas as an expert.[10]

---

[10] Mr. Ford also argues that Detective Thomas was improperly allowed to testify to an ultimate issue, thereby usurping the jury role. In the absence of an objection at trial, Detective Thomas's testimony that he ordinarily tells the government that a case is "consistent with possession with intent to distribute" did not plainly exceed the scope of expert testimony. Experts are not prohibited from

## D.    Merger

Mr. Ford's third argument is that the trial court erred by not merging his conviction for PWID PCP with his conviction for possession of liquid PCP.   The government charged Mr. Ford with unlawful possession with intent to distribute (PWID) PCP,[11] unlawful possession of liquid PCP, PWID cocaine, unlawful possession of cocaine, and unlawful possession of drug paraphernalia.   During deliberations, the jury asked whether unlawful possession of liquid PCP was a lesser offense of PWID PCP in the same way that possession of cocaine was a lesser offense of PWID cocaine.  After discussing the matter with the attorneys, the trial court responded that unlawful possession of PCP was a "separate and independent charge."

In *Young v. United States*, 143 A.3d 751, 760–61 (D.C. 2016), this court

---

"stating opinions on ultimate facts or issues to be resolved by the jury." *Jackson v. United States*, 76 A.3d 920, 940 (D.C. 2013) (quoting *Blaize v. United States*, 21 A.3d 78, 84 n.8 (D.C. 2011)).  In some cases, however, "expert opinions that draw specific conclusions about a particular witness will constitute an improper commentary that has the effect of 'submitting the whole case to an expert witness for decision.'"  *Robinson v. United States*, 50 A.3d 508, 527 n.18 (D.C. 2012) (quoting *Ibn-Tamas v. United States*, 407 A.2d 626, 632 (D.C. 1979) (cleaned up)).

[11]  The verdict form did not specify what drug Mr. Ford was alleged to have possessed with intent to distribute, but the court instructed the jury that Count 1 was specific to PCP.  The jury asked the court to clarify whether the verdict form or the instructions were correct on this matter, and the court responded that Count 1 specifically involved possession with the intent to distribute PCP.

concluded that unlawful possession of liquid PCP merges with PWID PCP under the Double Jeopardy Clause, and the government agrees that *Young* controls. Thus on remand, the trial court should vacate Mr. Ford's conviction for possession of liquid PCP.

## III.

For the foregoing reasons, we retain jurisdiction over the appeal and remand the record to the trial court pursuant to D.C. Code § 17-306 (2012 Repl.), with additional instructions to vacate Mr. Ford's conviction for possession of liquid PCP. After the trial court issues findings as to whether Officer Branson had lawful authority to conduct a search of Mr. Ford's pockets on grounds other than consent, it shall return the supplemented record to this court for decision. *Laniyan*, 226 A.3d at 1153.

*So ordered.*

NEBEKER, *Senior Judge*, dissenting: The remand is in violation of the Prevailing Party Rule; the record must be read according to that Rule in favor of the government. What the majority gleans from the record to create a factual

question for remand carries an equally contrary and reasonable inference we must indulge—that Ford wanted reflectively and, with guilty knowledge, to stop by force the inevitable seizure of his contraband PCP.  If he had been able to shoot the officer would we say he merely wished to withdraw his earlier consent?  Hardly.

The arguments made by Ford's counsel after the court's denial of the suppression ruling were improper because counsel was impermissibly arguing WITH the court, and because Ford's counsel did not argue the points during the suppression hearing, and failed to request reopening of the suppression hearing.  Thus, a remand is not "just under the circumstances."  *See* D.C. Code § 17-306.

Since we are inviting the court to consider, "whether Officer Branson had lawful authority to conduct a search of Mr. Ford's pocket on grounds other than consent," I offer further authorities to affirm the denial of suppression.  There was probable cause to arrest Ford for unlawful possession of an illicit drug based on what the officer saw and his experience and training.  *See Bell v. United States*, 254 F.2d 82, 86 (D.C. Cir. 1958); *see also Payne v. United States,* 294 F.2d 723, 725 (D.C. Cir. 1961); *see also M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971).  These decisions require affirmance on the above theories even though they were not considered by the officer, the parties or the trial court.  Additionally, the split second cuffing of Ford's hand is justified as an effort to avoid a struggle with him

for which injuries could have resulted. *See Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). "To remand a case where, as here, there is no appreciable possibility that a further hearing in the trial court would affect the ultimate outcome, is unnecessary and incompatible with '[g]ood judicial husbandry.'" *Stewart v. United States*, 37 A.3d 870, 878 (D.C. 2012) (quoting *In re Melton,* 597 A.2d 892, 908 (D.C.1991) (en banc)).